

FILED

NOV 1 2 2020

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

SHANE CAVANAUGH, an individual and as personal representative and successor in interest of the Estate of RICHARD BOULANGER; the Estate of RICHARD BOULANGER,

            Plaintiffs,

v.

COUNTY OF SAN DIEGO, a municipal Corporation; SHERIFF BILL GORE, individually and in his official capacity as Sheriff for the County of San Diego; KEVIN KAMOSS, in his individual and offical capacity; STANLEY DIXON, in his individual and official capacity; JOSEPH REYES, in his individual and official capacity; and DOES 1-50 inclusive,

            Defendants.

Case No.: 3:18-cv-02557-BEN-LL

**ORDER GRANTING:**

**(1) DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT *WITH PREJUDICE***

**(2) JOINT MOTION TO DISMISS DEFENDANTS BRETT GERMAIN AND MICHAEL PACHECO**

**[ECF Nos. 56, 59, 61, and 63]**

## I.    INTRODUCTION

   Plaintiff Shane Cavanaugh, an individual and as personal representative and successor in interest of the Estate of Richard Boulanger along with the Estate of Richard Boulanger (collectively, "Plaintiffs") brings this wrongful death action against

-1-

Defendants COUNTY OF SAN DIEGO, a municipal Corporation; Sherriff BILL GORE individually and in his official capacity as Sherriff for the County of San Diego; KEVIN KAMOSS, in his individual and official capacity; STANLEY DIXON, in his individual and official capacity; JOSEPH REYES, in his individual and official capacity; and JAMES PARENT, in his individual and official capacity (collectively, "Defendants"). ECF No. 55.

Before the Court is Defendants' Motion to Dismiss and Strike Plaintiffs' Second Amended Complaint (the "Motion"). ECF No. 56. Plaintiffs opposed. ECF No. 59. Defendants filed a reply brief. ECF No. 63. The Court also considers the Joint Motion to Dismiss Defendants Brett Germain and Michael Pacheco *with prejudice*. ECF No. 61.

The motions were submitted on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1) and Rule 78(b) of the Federal Rules of Civil Procedure ("FRCP"). ECF No. 64. After considering the papers submitted, supporting documentation, and applicable law, the Court **GRANTS** the Joint Motion as well as Defendants' Motion to Dismiss the Second Amended Complaint without leave to amend.

## II.    BACKGROUND

### A.    Statement of Facts[1]

---

[1]    The majority of the facts set forth are taken from the operative complaint, and for purposes of ruling on Defendants' motion to dismiss, the Court assumes the truth of the allegations pled and liberally construes all allegations in favor of the non-moving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Additional facts were also taken from Plaintiff's *Ex Parte* Motion for Order Appointing Cavanaugh. ECF No. 20; *see Rosen v. Uber Techs., Inc.*, 164 F. Supp. 3d 1165, 1171 (N.D. Cal. 2016) (providing that "[f]or purposes of a Rule 12(b)(6) motion...the court can [also] 'augment' the facts and inferences from the body of the complaint with 'data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice'"); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied"); *United States v. Wilson*, 631 F.2d 118, 119 (9th Cir.1980) (providing that "a court may take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases").

This case arises out of the death of Richard Boulanger ("Decedent" or "Mr. Boulanger") on February 14, 2016 in the San Diego County Central Jail ("SDCCJ"), at the age of 51 years old. Second Amended Complaint, ECF No. 55 ("SAC") at 12-15; ECF No. 20 at 9, ¶¶ 2-4. His son, Shane Cavanaugh ("Mr. Cavanaugh"), as administrator of Mr. Boulanger's estate, brings this action both on Mr. Boulanger's behalf as his personal representative as well as on behalf of himself as Mr. Boulanger's heir. *Id.* at 3:1-5. The record indicates Mr. Boulanger died intestate and had at least one other child: Desiree Boulanger. Declaration of Shane Cavanaugh, ECF No. 20 at 9-10. This is significant, as will be seen later.

On February 9, 2016, Mr. Boulanger was arrested for a non-violent crime and placed in the San Diego County Central Jail ("SDCCJ"). SAC at 7:19-23. At the time of his arrest, Mr. Boulanger was a known opiate user and suffering from withdrawal symptoms. *Id.* at 7:21-23. During the booking process, Mr. Boulanger (1) tested positive for narcotics, including cocaine and heroin; (2) "told jail staff" he used heroin and drank alcohol on a daily basis; (3) was observed as experiencing withdrawal symptoms; (4) was noted as having a history of mental illness; and (5) was provided medication for his withdrawal symptoms. *Id.* at 7:24-8:3. Later, Mr. Boulanger was placed in jail cell 4B 1 "FOUR-BAKER." *Id.* at 8:4.

On February 12, 2016, at 5:19 p.m., Defendant Deputy Joseph Reyes ("Deputy Reyes") performed a soft count,[2] which is required by the San Diego County Sheriff's Detention Policy.[3] SAC at 17:7-17. Video surveillance shows Deputy Reyes closing Mr. Boulanger's cell door and walking past the next four cells without stopping or peering into

---

[2]   According to the complaint, a soft count "is an inmate count that 'verifies each inmate's well-being through verbal or physical acknowledgement from the inmate.'" SAC at 15:15-20. These "[s]oft counts are specifically to show there is proof of life." *Id.* at 16:8.
[3]   Sheriff's Detentions Policy I.43, INMATE COUNT PROCEDURE, "establishes a uniform procedure for physically counting and verifying the well-being of all inmates" by requiring detentions staff to verify "each inmate's well-being through verbal or physical acknowledgment from the inmate." SAC at 15:28-16:5.

the cells. *Id.* at 17:11-17. During the soft count at approximately 5:25 p.m., video surveillance shows Deputy Reyes "walking up to each cell and peering in for approximately 1 second before proceeding to the next cell." *Id.* at 17:18-21. SDCCJ's Green Sheet Policy requires that soft counts are "conducted at the beginning and end of [e]very shift, and that a printed Operations Report (Count Sheet) is utilized while conducting these 'Soft Counts.'" *Id.* at 16:12-17. At 6:00 p.m., at the end of Deputy Reyes' shift, surveillance video also shows him performing a security check (also known as a head count), rather than a soft count, by peering into each cell for only one second and without consulting paperwork. *Id.* at 17:26-18:4; *see also* Defendants' Opposition to Plaintiffs' Motion for Leave to File Second Amended Complaint, ECF No. 35-1 at 14.

That same day, at an unknown time, Deputy James Parent ("Deputy Parent") was stationed in the watchtower and "took over watch" for approximately one hour for a deputy working before Defendant Deputy Stanley Dixon ("Deputy Dixon") started his shift. SAC at 13:25-28. While Deputy Parent was filling in for the deputy, he muted the Emergency Intercom System. *Compare* SAC at 11:22-25 (alleging that "[w]hen DIXON started his shift on February 12, 2016, he essentially walked in, turned everything off, and disregarded all inmates and medical issues or emergencies they may have had") *with* SAC at 13:25-14:8 (pleading that "[p]rior to DIXON starting his shift," Deputy Parent chose "to not perform any of his duties correctly, ie muting the Emergency Intercom System to shut out inmate calls for help and/or immediate assistance"); *id.* at 14:4-20 (alleging that "DIXON and/or PARENT intentionally manipulated the emergency intercom system"); ECF No. 35-1 at 14 (noting in the County of San Diego Citizens' Law Enforcement Review Board ("CLERB"), that "Deputy 1 . . . reported that sometime prior to his shift, the audio alert function of the inmate intercom system had been muted, with the volume turned all the way down").[4] However, Sheriff's Detentions Policy I.I requires alarm buttons in inmate

---

[4]   Although there are conflicting allegations as to who muted the intercom, where the allegations of a complaint conflict, the Court is not required to accept those allegations as true, *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998), and the

cells to be connected to a central control area to ensure constant monitoring of the alarms with appropriate, timely assistance dispatched to the scene of any alarm. SAC at 9:16-27.

Also, on February 12, 2016, at an unknown time likely between 5:30 p.m. and 6:00 p.m.,[5] Mr. Boulanger's cellmate woke up to find Mr. Boulanger hanging from the bunk bed with what appeared to be a rope fabricated from a sheet around Mr. Boulanger's neck. SAC at 8:5-9; ECF No. 35-1 at 13-14. Mr. Boulanger's cellmate called for help four to ten times using an intercom system in each cell, but no one responded. SAC at 8:10-18. After no one responded to the calls via the intercom, the cellmate started banging on the doors

---

majority of Plaintiffs' own allegations, SAC at 14:4-8, along with the CLERB Report, which the Court takes judicial notice of as a public record, *Wilson*, 631 F.2d at 119, indicate Deputy Parent, rather than Deputy Dixon, muted the intercom.

[5] The SAC does not allege whether Mr. Boulanger's death took place while Deputy Reyes was working. However, the reasonable inference is that at 6:00 p.m., a shift change took place. *See* SAC at 17:26-27 (pleading that "[s]urveillance video from the 6:00 end of shift count documents REYES walking"); *id.* at 13:25 (noting that "[p]rior to DIXON starting his shift," Deputy Parent took over watch for the deputy working before Deputy Dixon); *id.* at 10:21-24 (alleging that "[v]ideo surveillance shows . . . inmates . . . banging on their cell door until deputies discovered Boulanger randomly during an opening shift count); *id.* at 11:12-13 (alleging that Deputy Dixon "described how he was informed of Boulanger's emergency," indicating he was working at the time Mr. Boulanger was discovered, although not necessarily when he first attempted suicide). Thus, the Court finds a reasonable inference is that at 6:00 p.m., a shift change occurred, and Deputy Dixon came on shift while Deputy Reyes ended his shift. *See id.* at 17:26-27, 13:25, 10:21-24, 11:12-13. Further, if Deputy Dixon was working when Mr. Boulanger was discovered, another reasonable inference is that Deputy Reyes was no longer working at that time. *Id.* The SAC and CLERB also indicate that after Mr. Boulanger attempted suicide, it took somewhere between 10 to 30 minutes to discover his body. SAC at 8:21-23, 9:1-4, 11:14-21; ECF No. 35-1 at 14. As a result, if Mr. Boulanger's body was discovered during the opening shift count for the 6:00 p.m. shift, and it took 10 to 30 minutes to discover his body, another reasonable inference is that Mr. Boulanger attempted suicide somewhere between 5:30 p.m. and 6:00 p.m., and his body was discovered sometime between 6:00 p.m. and 6:30 p.m. As pled, however, Mr. Boulanger's time of death is unknown, and the SAC does not allege that Deputy Dixon was working at the time Mr. Boulanger was discovered. *See generally* SAC. That this is not clearly pled in the SAC is indicative of the insufficiency of the factual allegations in the SAC.

of his cell. *Id.* at 8:19-21. Somewhere between 10 to 30 minutes[6] passed before Deputies Michael Pacheco and Brett Germain "randomly discovered" Mr. Boulanger during an opening shift count. *See* SAC at 10:21-24. Deputies Pacheco and Germain notified Deputy Dixon, who was working at the watchtower, by radio that Mr. Boulanger had hung himself. *Id.* at 8:21-23, 9:1-4, 11:14-21. It was not until that point in time that Deputy Dixon discovered the intercom had been muted. *See id.* at 11:15-21 ("once they . . . got there . . . and it passed word through the radio that we got a hanger, then I was like okay, let me check, make sure to see if anybody called . . . that's when I seen something kind of flashing and all that . . . that's when I knew").

As soon as they discovered Mr. Boulanger's body, deputies temporarily resuscitated and revived Mr. Boulanger, and he was transported to UCSD Medical Center. SAC at 9:5-8. However, on February 14, 2016, two days later, Mr. Boulanger developed multisystem failure and died. *Id.* at 9:8-19.

Plaintiffs assert that Defendants violated Mr. Boulanger's rights by, *inter alia*, failing to (1) keep him in a safe and secure environment where he could be kept free from injury, harm, and death and (2) provide him with adequate medical care and attention, in violation of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. *See* ECF. No. 17. Plaintiffs further allege that Defendants' (1) deliberate indifference to Mr. Boulanger's serious medical needs violated Mr. Boulanger's civil rights and (2) "failure to train, supervise and/or take other measures at the Central Jail to prevent the conduct that caused the untimely and wrongful death of Richard Boulanger deprived Plaintiffs of their liberty interest in the parent-child relationship in violation of their substantive due process rights as defined by the First and Fourteenth Amendments to the

---

[6] *Compare* at SAC at 8:21-23, 9:1-4, 11:14-21 (alleging that "[i]t took over a half-hour before any deputies arrived") *with* ECF No. 35-1 at 14 (noting in the CLERB Report that "[p]er the cellmate's account, it took approximately 10 to 20 minutes before deputies arrived"). Although for purposes of a motion to dismiss, the Court must construe all facts in the light most favorable to Plaintiffs, the Court may also take judicial notice of inconsistent facts in the record. *Wilson*, 631 F.2d at 119.

United States Constitution." SAC at 30:27-31:8.

Mr. Boulanger's death certificate indicates that the immediate cause of death was (a) acute diffuse anoxic/ischemic encephalopathy,[7] but the certificate instructed the individual completing it to "[e]nter the chain of events that directly caused death," and as such, (b) resuscitated cardiac arrest and (c) ligature hanging were also listed. ECF No. 20 at 16. When asked to describe how the injury occurred, the certificate states "HANGED SELF WITH STRIPS OF SHEET ATTACHED TO BED POLE." *Id.* at 16. Manner of death is listed as "suicide," on February 12, 2016, with the hour listed as unknown. *Id.*

## B.   Procedural History

On February 9, 2018, Plaintiff filed this lawsuit against Defendants County of San Diego and Sheriff William Gore ("Sheriff Gore") in the San Diego Superior Court, alleging causes of action for violation of his civil rights pursuant to 42 U.S.C. § 1983 for (1) violation of Plaintiff's Eighth and Fourteenth Amendment rights; (2) deliberate indifference to the decedent's medical needs; (3) wrongful death; (4) loss of familial relationship; (5) pain and suffering (survival action); and (6) *Monell* municipal liability. *See* Notice of Removal, ECF No. 1-4.

On February 27, 2018, Defendants County of San Diego and Sheriff Gore were served with the complaint, ECF No. 10 at 2:4-5, and on March 22, 2018, they filed an answer, ECF No. 4 at 33-37. However, on November 8, 2018, Defendants County of San Diego and Sheriff Gore filed a Notice of Removal, removing this case to the Southern District of California. ECF No. 1. On December 4, 2018, Defendants filed their Answer. ECF No. 3. On December 5, 2018, Plaintiffs filed a Motion for Remand, ECF No. 4,

---

[7]   Anoxic brain injury is an injury caused by a lack of oxygen. *See* June Mary Zekan Makdisi, *Nutrition and Hydration Under Ohio's Dpah: Judicial Misconstruction Threatens the Right to Choose Death with Dignity*, 38 Clev. St. L. Rev. 279, 289 (1990) ("Anoxia is a condition where the oxygen supply has been cut off, such as when respiration ceases or the heart stops pumping blood through the lungs and to the brain."). Similarly, hypoxic ischemic encephalopathy is defined as "generally permanent brain injury resulting from a lack of oxygen or inadequate blood flow to the brain." *Hypoxic Ischemic Encephalopathy*, Stedmans Medical Dictionary, 289320, (2014).

which this Court denied on July 16, 2019, due to the case involving federal claims under 42 U.S.C. § 1983, ECF No. 10.

On August 25, 2019, Plaintiffs filed their first motion to amend the complaint, which included the same claims but sought to add Defendants Kevin Kamoss, Michael Pacheco, Brett Germain, Stanley Dixon, and Joseph Reyes as defendants as well as plead additional facts. ECF No. 17. The following day, on August 26, 2019, Plaintiff also filed an *Ex Parte* Motion to Appoint Plaintiff Shane Cavanaugh as Successor-in-Interest to the Estate of Richard Boulanger, noting he had discovered he had a half-sister, Desiree Boulanger, with whom he could no longer get in contact. ECF No. 20 at 8-11 (declaring his father died intestate). On October 10, 2019, this Court granted both motions. ECF Nos. 29, 30.

On October 17, 2019, Plaintiff filed the First Amended Complaint ("FAC") alleging the same six claims for relief, adding the aforementioned defendants, and demanding a jury trial. ECF No. 31. A mere week after filing the FAC, Plaintiff filed a Motion for leave to file a Second Amended Complaint ("SAC"), seeking to plead additional factual allegations as well as add two new parties: Deputy William Zepeda and Deputy James Parent. ECF No. 32 at 1:18-24.

Meanwhile, on October 31, 2019, Defendants County of San Diego, Sheriff Gore, Kevin Kamoss, Michael Pacheco, Brett Germain, Stanley Dixon, and Joseph Reyes filed a Motion to Dismiss the FAC, or in the alternative, to strike portions thereof. ECF No. 33.

On August 24, 2020, this Court (1) granted in part and denied in part Plaintiff's Motion for Leave to File the SAC and (2) denied Defendants' Motion to Dismiss the FAC as moot (due to the Court's decision to allow Plaintiffs to file the SAC). ECF No. 54. The Court allowed Plaintiffs to add Deputy Parent as a defendant but did not permit Plaintiffs to add Deputy Zepeda as a defendant due to his death before being named in the lawsuit. *Id.* at 13:1-6.

On August 31, 2020, Plaintiffs filed the operative complaint, the SAC, against Defendants County of San Diego, Sheriff Gore, Kevin Kamoss, Michael Pacheco, Brett

Germain, Stanley Dixon, Joseph Reyes, and James Parent, alleging claims for relief[8] arising under 42 U.S.C. § 1983 for: (1) wrongful death; (2) deliberate indifference to Decedent's medical needs; (3) loss of familial relationship/loss of association; (4) failure to properly train; (5) *Monell* entity liability; and (6) a survival action. ECF No. 55.

On September 14, 2020, Defendants filed a Motion to Dismiss the SAC and Strike Portions thereof pursuant to Rule 12(b)(6) and (f). ECF No. 56. On September 28, 2020, Plaintiffs filed their opposition. ECF No. 59. On October 9, 2020, Defendants filed their reply brief. ECF No. 63.

On September 28, 2020, Defendants also filed an *Ex Parte* Motion to Continue or Vacate All Remaining Pre-Trial Motion Deadlines and Mandatory Settlement Conference Dates While Defendants' Motion to Dismiss is Pending. ECF No. 58. On September 29, 2020, Plaintiffs opposed this *Ex Parte*. ECF No. 60. On October 5, 2020, Magistrate Judge Linda Lopez granted in part and denied in part Defendants' *Ex Parte* Motion, which ordered, *inter alia*, that (1) all pretrial motions be filed by November 9, 2020, and (2) the pretrial conference would take place on March 8, 2021. ECF No. 62.

On October 5, 2020, Plaintiffs and Defendants also submitted a Joint Motion to Dismiss Defendants Pacheco and Germaine from this lawsuit. ECF No. 61.

## III.   LEGAL STANDARD

### A.   Motion to Dismiss

Under FRCP 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to set forth a set of facts which, if true, would entitle the complainant to relief. *Bell*

---

[8]   Plaintiffs' SAC uses the term "cause of action." This Court will refer to Plaintiffs' "causes of action" as "claims for relief." *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1264–70, n. 2 (9th Cir. 2006) (providing that "[a] 'cause of action' under California law is equivalent to a 'claim' under federal law, although the California system is based upon the old code pleading system, . . . [u]nder the federal system, 'the word "claim" denotes the allegations that give rise to an enforceable right to relief'"); *see also* FED. R. CIV. P. 8 (requiring a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief").

1   *Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 679

2   (2009) (holding that a claim must be facially plausible to survive a motion to dismiss). The

3   pleadings must raise the right to relief beyond the speculative level; a plaintiff must provide

4   "more than labels and conclusions, and a formulaic recitation of the elements of a cause of

5   action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265,

6   286 (1986)). On a motion to dismiss, a court accepts as true a plaintiff's well-pleaded

7   factual allegations and construes all factual inferences in the light most favorable to the

8   plaintiff. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir.

9   2008). A court is not required to accept as true legal conclusions couched as factual

10  allegations. *Iqbal*, 556 U.S. at 678.

11         "Generally, unless the court converts the Rule 12(b)(6) motion into a summary

12  judgment motion, it cannot consider material outside the complaint (e.g., facts presented

13  in briefs, affidavits or discovery materials)." Phillips & Stevenson, *California Practice

14  Guide: Federal Civil Procedure Before Trial* § 9:211 (The Rutter Group April 2020).

15  Thus, in evaluating a Rule 12(b)(6) motion, review is ordinarily limited to the contents of

16  the complaint and material properly submitted with it. *Van Buskirk v. Cable News

17  Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner

18  & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). Under the incorporation by

19  reference doctrine, the court may also consider documents "whose contents are alleged in

20  a complaint and whose authenticity no party questions, but which are not physically

21  attached to the pleading" without converting a motion to dismiss to a motion for summary

22  judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds

23  by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1121 (9th Cir. 2002). The court may

24  treat such a document as "part of the complaint, and thus may assume that its contents are

25  true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*,

26  342 F.3d 903, 908 (9th Cir. 2003). "Plaintiffs may plead themselves out of court by

27  attaching exhibits inconsistent with their claims because the court may disregard

28  contradictory allegations." Phillips, § 9:212a; *Johnson v. Fed. Home Loan Mortg. Corp.*,

-10-

1   793 F.3d 1005, 1007–08 (9th Cir. 2015) (noting that courts "need not accept as true

2   allegations contradicting documents that are referenced in the complaint").   Courts may

3   also consider any statements made in a pleading or motion, including concessions made in

4   plaintiff's response to the motion to dismiss as well as in response to any other pleading or

5   motion.   FED. R. CIV. P. 10(C).

6       When a motion to dismiss is granted, the court must decide whether to grant leave

7   to amend.  The Ninth Circuit has a liberal policy favoring amendments, and thus, leave to

8   amend should be freely granted.  *See, e.g., DeSoto v. Yellow Freight System, Inc.*, 957 F.2d

9   655, 658 (9th Cir. 1992).   However, a court need not grant leave to amend when permitting

10  a plaintiff to amend would be an exercise in futility.  *See, e.g., Rutman Wine Co. v. E. & J.

11  Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) ("Denial of leave to amend is not an abuse

12  of discretion where the pleadings before the court demonstrate that further amendment

13  would be futile.").

14      **B.**   **Motion to Strike**

15      FRCP 12(f) allows a court to "strike from a pleading an insufficient defense or any

16  redundant, immaterial, impertinent, or scandalous matter."   Immaterial matters are "those

17  which ha[ve] no essential or important relationship to the claim for relief or the defenses

18  being pleaded."  *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on

19  other grounds*, 510 U.S. 517 (1994) (internal quotation marks omitted).   Impertinent

20  matters "do not pertain, and are not necessary, to the issues in question."  *Id.* (internal

21  quotation marks omitted).

22      The purpose of a Rule 12(f) motion "is to avoid the expenditure of time and money

23  that must arise from litigating spurious issues by dispensing with those issues prior to trial."

24  *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (internal quotation

25  marks omitted).   "Motions to strike are generally disfavored and 'should not be granted

26  unless the matter to be stricken clearly could have no possible bearing on the subject of the

27  litigation.'"  *Luxul Tech. Inc. v. NectarLux, LLC*, 2015 WL 4692571, at *3 (N.D. Cal. Aug.

28  6, 2015) (quoting *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D.

1   Cal. 2004)).  The decision to grant a motion to strike ultimately lies within the discretion

2   of the trial court.  *Rees v. PNC Bank, N.A.*, 308 F.R.D. 266, 271-72 (N.D. Cal. 2015) (citing

3   *Whittlestone*, 618 F.3d at 973).

4   **IV.   DISCUSSION**

5          Defendants move to dismiss Plaintiff's SAC under FRCP 12(b)(6) and (f).

6   Defendants argue for dismissal of the SAC by contending that (1) as to Defendants

7   Kamoss, Reyes, and Dixon, Plaintiffs' allegations, even if assumed true, do not amount to

8   a violation of Mr. Boulanger's constitutional rights, and in the absence of a violation of a

9   constitutional right, a case brought pursuant to 42 U.S.C. § 1983 ("Section 1983") will fail

10   as a matter of law; (2) if Deputies Reyes and Dixon—the individuals who Plaintiffs allege

11   were improperly trained and supervised—never violated Mr. Boulanger's constitutional

12   rights, there can be no claims against Sheriff Gore, Lieutenant Kamoss, and the County of

13   San Diego for improperly training or supervising them; (3) even if Plaintiffs could establish

14   Defendants violated Mr. Boulanger's constitutional rights, Defendants are entitled to

15   qualified immunity; and (4) Plaintiffs fail to set forth a county-wide policy of violating

16   constitutional rights in order to establish liability against the County of San Diego given

17   the SAC alleges the actions Plaintiffs take issue with violated county policy, and as such,

18   could not possibly have been the policy.  Motion, ECF No. 56-1 at 8:3-9:13.

19          Defendants also ask the Court to strike (1) the claims against Lieutenant Kamoss and

20   Sheriff Gore (collectively, the "Supervisory Defendants") in their official capacity (as

21   opposed to their individual capacity) as duplicative, Mot. at 19:9-11, (2) paragraphs 148,

22   150-152, and 155-156, alleging "a litany of systematic deficiencies not relevant to the

23   allegations in the SAC or the circumstances that led to Mr. Boulanger's suicide," *id.* at

24   24:19-25:9, and (3) the first and sixth claims for relief as duplicative of the second, third,

25   fourth claims for relief, *id.* at 26:17-28.

26          In their Opposition to the Motion, Plaintiffs spend the first five pages of the

27   opposition, rather than addressing the merits of the Motion, copying and pasting

28

approximately two pages of this Court's previous orders[9] while using the other three pages to criticize Defendants and discuss statistics on jailhouse suicides. *See generally* Opposition, ECF No. 59 at 10-14. Instead of setting forth case law supporting why their factual allegations state a claim for relief under Section 1983, Plaintiffs spend another more than four pages copying and pasting the very same factual allegations sections from the SAC that Defendants contend inadequately state a claim for relief. *Id.* at 15-19. When Plaintiffs finally address the merits, they argue that "[i]t is obvious that Richard Boulanger had serious medical needs," *id.* at 20:4, and "[t]he SAC adequately alleges facts to satisfy all Gordon elements," *id.* at 25:11-13. However, Plaintiffs' Opposition cites no analogous binding case law holding deputies liable for inadequate monitoring resulting in delayed medical care to an inmate after a suicide attempt where there are no allegations that the deputies monitoring the inmate knew the inmate was at risk of suicide. *See generally* Oppo. Plaintiffs also conclusorily argue that (1) their third claim for relief for loss of familial relationship is adequately pled, Oppo. at 26:1-6, (2) "[t]he SAC sufficiently alleges GORE and KAMOSS failed to train and failed to supervise their deputies," *id.* at 28:1-2, (3) Defendants are not entitled to qualified immunity because they "knew or should have known of Boulanger's serious medical needs during his stay," *id.* at 31:13-15, (4) "it is plausible to conclude that the facts stated in the SAC, paired with CLERB's findings, are more than sufficient for a valid *Monell* claim, *id.* at 34:6-8, and (5) the wrongful death and survival actions are not duplicative, and as such, should not be stricken, *id.* at 34:9-20.

---

[9]   Plaintiffs argue that "[r]eading between the lines [of the Court's order on Defendant's Motion to Dismiss the FAC], and taking all of Section 2(B) of the Court's ORDER into context, Plaintiffs interpret the Court's explanation in Section 2(B) to direct Defendants that a Motion to Dismiss should not be filed again and/or would be denied." ECF No. 59 at 12:5-8. However, in the order Plaintiffs refer to, the Court denied the previous motion to dismiss as moot based on its decision to grant Plaintiffs leave to file an amended complaint. ECF No. 54 at 12. Thus, contrary to Plaintiffs' argument, the Court's previous order contained no language prohibiting a motion to dismiss subsequent complaints, and instead, merely denied the previous motion to dismiss as moot due to the Court's decision to allow Plaintiffs to file a new amended complaint. *Ramirez v. Cty. of San Bernardino*, 806 F.3d 1002, 1008 (9th Cir. 2015).

In their reply brief, Defendants first, clarify that their position as to the wrongful death and survival claims is not that they are identical to one another—as Plaintiffs alluded to in their Opposition, but rather that a wrongful death claim is not cognizable under Section 1983 while the survival claims are duplicative of Plaintiffs' second, fourth, and fifth claims brought under Section 1983. Reply, ECF No. 63 at 2:16-3:9. Second, Defendants point out that "Plaintiffs' allegations surrounding Mr. Boulanger's 'serious medical need' have never been clear," and Plaintiffs now try to argue he had a known suicide risk by stating facts in their opposition not contained in the SAC. *Id.* at 3:11-4:12. Third, Defendants argue that while Plaintiffs argue Defendants were deliberately indifferent, the SAC actually "pleads that as soon as Defendants learned Mr. Boulanger attempted suicide, Deputies took appropriate action to provide him with care." *Id.* at 4:20-21. They further point out that (1) Plaintiffs' allegations as to who turned off the intercom system are inconsistent, *id.* at 6:15-25, and (2) while Plaintiffs allege Deputy Reyes "conducted a procedurally improper end-of-shift inmate check at 6:00 p.m.," Plaintiffs fail to "allege that Mr. Boulanger was experiencing medical distress at that point (or at any point prior) . . . while Deputy Reyes was present or working at all," *id.* at 7:5-9. Thus, Defendants argue that Plaintiffs' allegations against Defendants, at most, sound in negligence, which does not meet the standard for deliberate indifference. *Id.* at 7:15-24. Fourth, Defendants argue that the Court should grant their request that all of Plaintiffs' claims against the individual defendants in their official capacities be dismissed or stricken as "duplicative of Plaintiffs' claims against the County" because Plaintiffs failed to address that argument in their Opposition. *Id.* at 8:1-15. Fifth, Defendants note that "[a]lthough Plaintiffs' opposition contains multiple pages setting forth the qualified immunity standard, Plaintiffs fail to identify a ***single*** case (let alone controlling precedent) involving a constitutional violation by jail deputies (or their supervisors) facing sufficiently similar circumstances." *Id.* at 9:18-26. Thus, Defendants argue Plaintiffs have not met their burden of identifying controlling "clearly established law" to defeat Defendants' entitlement to qualified immunity. *Id.* at 10:1-3. Sixth, Defendants point out that

-14-

"Plaintiffs concede that if no individual Defendants violated Mr. Boulanger's constitutional rights, then *all* of Plaintiffs' municipal civil-rights claims are moot." *Id.* at 10:6-9 (citing ECF No. 59 at 31:23-26). They also argue that while Plaintiffs argue in their Opposition that the County maintained an unconstitutional policy that allowed deputies and medical staff to deny medical care to inmates, the SAC "affirmatively alleges that Defendants acted *contrary* to express County policy," meaning that Plaintiffs' own allegations "defeat their unsupported accusation that a County policy directed the individual Defendants to violate the Constitution." *Id.* at 10:14-24. Defendants conclude by noting that Plaintiffs never allege any of the deputies knew Mr. Boulanger was in any type of medical distress until he was discovered, at which time, he was given medical care. Reply at 11:5-16.

Plaintiffs have pled the bare elements of a claim for relief under Section 1983. The problem lies in the fact that since the Supreme Court's decision in *Twombly* in 2007, a plaintiff must provide "more than . . . a formulaic recitation of the elements of a cause of action." 550 U.S. at 555. Here, Plaintiffs' SAC fails for several reasons: First, Plaintiffs' own inconsistent allegations make the constitutional violations they allege implausible. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988–89 (9th Cir.), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001) ("We have held that a plaintiff can—as Sprewell has done here—plead himself out of a claim by including unnecessary details contrary to his claims."); *see also Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295–96 (9th Cir. 1998) ("[W]e are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint."). Second, to the extent that Plaintiffs' wrongful death and survival actions are state law claims, Plaintiffs never alleged compliance with California's Government Claims Act. Third, Mr. Cavanaugh was improperly appointed as successor-in-interest, and until he can submit an amended affidavit, he may not properly pursue claims on behalf of the estate.

In sum, this Court grants Defendants' Motion to dismiss the SAC because, as analyzed below, as pled, Plaintiffs' claims fail as a matter of law. Because the facts of this

case indicate that Plaintiffs' legal theories fail, and Plaintiffs' three attempts at pleading the claims have still not produced a viable complaint, the Court also denies leave to amend.

### A.   **Plaintiffs' Motion to Dismiss Claims Under Section 1983**

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. Thus, to state a claim under Section 1983, a plaintiff must allege (1) the violation of a right secured by the Constitution and laws of the United States and (2) that the alleged deprivation was committed by a person acting under color of state law. *Id.*; *see also West v. Atkins*, 487 U.S. 42, 48 (1988); *Belgau v. Inslee*, 975 F.3d 940 (9th Cir. 2020). "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Here, Plaintiffs' SAC, upon first glance, pleads (1) violation of a constitutional right and (2) state action. However, as analyzed further, although Plaintiffs have met the initial hurdle of pleading the requisite elements, those allegations, when considered together as well as under the relevant law fail to state plausible claims for relief.

### 1.   ***Deprivation of a Constitutional Right***

"The first step in any such [1983] claim is to identify the specific constitutional right allegedly infringed." *Albright*, 510 U.S. at 271. As to the first prong, the SAC alleges violations of (1) Mr. Boulanger's First, Fourth, Eighth, and Fourteenth Amendment rights, SAC at 23:24-24:8, 31:1-8, and (2) Mr. Cavanaugh's rights "to the society and companionship of his son [sic] which is protected by the substantive due process clause of the Fourteenth Amendment," *id.* at 31:14-18. Thus, on first glance, Plaintiffs have pled a violation of constitutional rights; however, the Court analyzes whether those allegations create a plausible claim for relief belief.

First, the Court notes that Plaintiffs make allegations of violations under the First

and Fourth Amendment.   SAC at 23:27-28.   However, the Court disregards these allegations because Plaintiffs set forth no factual allegations which would support a plausible theory of liability for violation of the (1) First Amendment rights to freedom of religion, speech, press, and assembly/petition and/or (2) Fourth Amendment rights to be free from unreasonable searches and seizures.   *Compare* U.S. CONST. amends. I and IV *with* SAC, ECF No. 55.   Plaintiffs also allege violation of Mr. Boulanger's Eighth Amendment rights, SAC at 24:2-3; however, as a pre-trial detainee, Mr. Boulanger had no Eighth Amendment rights.   *Compare* SAC at 7:18-23 (alleging Mr. Boulanger's arrest only—the SAC contains no allegations of a conviction) *with Mendiola–Martinez v. Arpaio*, 836 F.3d 1239, 1246 n.5 (9th Cir. 2016) ("Eighth Amendment protections apply only once a prisoner has been convicted of a crime, while pretrial detainees are entitled to the potentially more expansive protections of the Due Process Clause of the Fourteenth Amendment.").[10]  Thus, as currently pled, the only plausible theory of liability for a violation of constitutional rights that has been adequately pled stems from the violation of Mr. Boulanger's and Mr. Cavanaugh's Fourteenth Amendment rights.[11]

---

[10]   In fact, pretrial detainees, like Mr. Boulanger, actually "possess greater constitutional rights than prisoners." *Stone v. City & Cty. of San Francisco*, 968 F.2d 850, 857 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992). Thus, while prisoners may be subjected to punishment, so long as it is not cruel and unusual in violation of the Eighth Amendment, the Due Process Clause of the Fourteenth Amendment protects pretrial detainees from any punishment at all before being proven guilty. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.")

[11]   Plaintiffs allege that "Defendant deputies deprived Richard Boulanger of his rights under the United States Constitution to be free from cruel and unusual punishment and punishment without due process." ECF No. 55 at 24:20-23. To the extent the Court liberally construes Mr. Boulanger's allegations in his favor to mean that he was subjected to any punishment at all in violation of his Fourteenth Amendment rights to Due Process, these allegations fail as well.   "For a particular governmental action to constitute punishment, (1) that action must cause the detainee to suffer some harm or 'disability,' and (2) the purpose of the governmental action must be to punish the detainee." *Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004) (citing *Bell*, 441 U.S. at 538). Even if Mr. Boulanger alleged that the wrongful conduct he alleges (e.g., inadequate cell checks and

-17-

The Due Process Clause of the Fourteenth Amendment provides: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1.   The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

In light of the lack of applicability of the Eighth Amendment to Mr. Boulanger, Plaintiffs' alleged constitutional violations as to Mr. Boulanger's rights are unclear at best. However, the Court liberally construes them as a violation of his Fourteenth Amendment right to be free from deprivation of life without due process of law (e.g., a procedural due process claim).   To plead a procedural due process violation, a plaintiff must allege (1) the plaintiff has "a liberty or property interest which has been interfered with by the State" and (2) the procedures used to deprive the plaintiff of liberty or property were constitutionally insufficient. *Ky. Dep't. of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).   Again, liberally construing Plaintiffs' SAC, it alleges (1) Defendants interfered with his right to life and (2) the procedures used to deprive Mr. Boulanger of his right (e.g., the inadequate cell checks and muting of the intercom) were constitutionally insufficient.   As analyzed below, although these allegations are only arguably adequately pled, they ultimately fail as a matter of law.

As to Mr. Cavanaugh, the SAC alleges that Defendants deprived "Boulanger's son, Shane Cavanaugh, to the society and companionship of his son [sic] which is protected by the substantive due process clause of the Fourteenth Amendment."   SAC at 31:14-18; *see also id.* at 32:4-8 (pleading that Defendants "deprived Plaintiffs of their liberty interest in the companionship and society [of] one another").   Courts have held that "a child has a substantive due process right in her relationship with her parents which may be vindicated

---

muting the intercom) caused his harm, he has not alleged that the purpose of Defendants' government action (e.g., the inadequate cell checks and muted intercom) was to punish Mr. Boulanger.   Thus, the allegations pertaining to any constitutional rights against punishment are not plausible.

through a Section 1983 action." *M.H. v. Cty. of Alameda*, 62 F. Supp. 3d 1049, 1095 (N.D. Cal. 2014). Thus, these allegations pass muster on a preliminary review.

## 2. *State Action*

Action under color of state law is a jurisdictional prerequisite to a Section 1983 action because the Eleventh Amendment prohibits United States citizens from suing states. U.S. CONST., AMENDMENT XI; *West*, 487 U.S. at 46. As such, "[n]either a state nor state officials acting in their official capacities are 'persons' amenable to suit for damages under 42 U.S.C. § 1983." *Munoz v. Kolender*, 208 F. Supp. 2d 1125, 1150-51 (S.D. Cal. 2002). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West*, 487 U.S. at 49. Hence, to constitute state action, the deprivation at issue "must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible." *Id.* Essentially, the acts of the defendant in a Section 1983 action that are at issue must have been done while abusing power given to the defendant by the State. *Id.* Thus, "[t]he purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (citing *Carey v. Piphus*, 435 U.S. 247, 254-57 (1978)).

As to the second prong, Plaintiffs allege Defendants acted under color of state law. *See, e.g.*, SAC at 29:16-25 (alleging that "[a]cting under color of law, defendants failed to provide this care" and "deprive[d] the DECEDENT of urgently needed medical care in violation of his rights under the Fourteenth Amendment"). As such, Plaintiffs have plausibly alleged state action.

## B. **Plaintiffs' Second Claim for Relief for Deliberate Indifference Against Defendants Dixon, Reyes, Parent, and Kamoss.**

Plaintiffs' second claim for relief alleges that the Defendants Joseph Reyes, Stanley Dixon, James Parent, and Lieutenant Kamoss (collectively "Deputy Defendants") violated

Mr. Boulanger's Fourteenth Amendment right to medical care because they "were deliberately indifferent to Richard Boulanger's serious medical need, which caused harm to the decedent." SAC at 27:12-14.

Defendants argue that even though "Plaintiffs allege that Deputy Joseph Reyes performed his cell checks too quickly and that Deputy Stanley Dixon failed to hear the calls made by Mr. Boulanger's cellmates because the intercom was muted, . . . there is no allegation that Mr. Boulanger was in any form of distress when the deputy [Reyes] was performing his cell check." Mot. at 8:13-19. Defendants also argue that "Deputy Dixon's alleged failure to hear the intercom because it was muted is not a Constitutional violation." *Id.* at 8:19-21.

In order to establish a Section 1983 claim based on conditions of confinement, a plaintiff must allege facts showing that (1) the plaintiff has actually suffered an extreme deprivation or is placed at a substantial risk of suffering a significant injury (e.g., a serious medical need) and (2) the defendants acted with a sufficiently culpable state of mind (deliberate indifference). *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *May v. Baldwin*, 109 F. 3d 557, 565 (9th Cir. 1997); *see also* Mot. at 11:17-19 (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976).

As analyzed below, this Court finds that Plaintiffs' SAC fails as a matter of law because Plaintiffs have failed to plead facts sufficient to create a plausible claim that Defendants were deliberately indifferent under the law.

### 1. *Serious Medical Need*

Plaintiffs' Opposition conclusorily states that "[i]t is obvious that Richard Boulanger had serious medical needs." Oppo. at 20:4. Defendants' reply correctly notes that "Plaintiffs' allegations surrounding Mr. Boulanger's 'serious medical need' have never been clear, even though the present Complaint is now Plaintiffs' third bite at the apple." Reply at 3:14-16. Notably, the Court agrees with Defendants that Plaintiffs' SAC makes numerous references to "Boulanger's serious medical needs" but never actually alleges what that serious medical need was. SAC at 13:15, 14:11, 19:5, 26:7-8, 26:22-25. The

Court finds that this alone begs the question of whether Plaintiffs' third attempt at pleading their claims has failed. However, interpreting the complaint liberally and in Plaintiffs' favor, the Court reads the SAC as alleging that the serious medical need was "access to medical care" to prevent "his death." *See, e.g.*, SAC at 19:12-14 ("REYES was deliberately indifferent to Richard Boulanger's serious medical need" when he "disregarding the risk, delayed, denied, or obstructed Boulanger's access to medical care and thus caused his death."). However, other allegations indicate the serious medical need may be suicide risk. *See* SAC at 19:9-11 (pleading that "[t]he Ninth Circuit has held that a suicide risk or an attempted suicide is a serious medical need"). Later, the SAC suggests the serious medical need was a "failure to promptly treat his noose injury." *Id.* at 27:7-11 (pleading that "Defendant deputies knew or should have known that Richard Boulanger's condition was serious, . . . he was in significant pain, and that failure to promptly treat his noose injury could result in further significant injury and unnecessary and wanton infliction of pain").

"A 'serious' medical need exists if the failure to treat a prisoner's condition could result in [1] further significant injury or [2] the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc) (quoting *Estelle*, 429 U.S. at 104); *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019), *cert. denied sub nom. ID Doc., et. al. v. Edmo*, No. 19-1280, 2020 WL 6037411 (U.S. Oct. 13, 2020) (internal quotations omitted). Such serious medical needs include the (a) "existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment;" (b) "presence of a medical condition that significantly affects an individual's daily activities;" or (c) "existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059; *see also* ECF No. 59 at 19:20-25.

"A heightened suicide risk or an attempted suicide is a serious medical need." *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir. 2010), *cert. granted, judgment vacated sub nom. City of Reno, Nev. v. Conn*, 563 U.S. 915 (2011), and *opinion reinstated*, 658 F.3d 897 (9th Cir. 2011). "Drug withdrawal [also] constitutes a serious medical need requiring

-21-

appropriate medical care." *Villarreal v. Cty. of Monterey*, 254 F. Supp. 3d 1168, 1184–86 (N.D. Cal. 2017) (citing, *inter alia*, *Hernandez v. Cty. of Monterey*, 110 F. Supp. 3d 929, 948 (N.D. Ca. 2015) ("Withdrawal is a serious and potentially deadly medical condition, with symptoms including seizures, hallucinations, agitation and increased blood pressure."). "It is not necessary, moreover, that a serious medical need imminently result in death—an attempted suicide is sufficient." *Id.* at 1096.  However, "[t]he fact that a person is . . . suffering from mental problems more generally does not mean that officials are constitutionally required to anticipate and guard against suicide." *Moriarty v. Cty. of San Diego*, No. 17CV1154-LAB (AGS), 2019 WL 4643602, at *7-9 (S.D. Cal. Sept. 24, 2019) (Burns, J.) (holding sergeant was entitled to qualified immunity where an inmate committed suicide using two shirts but examination notes only indicated the individual was homicidal, not suicidal).

Here, the Court finds that Plaintiffs' SAC fails to adequately plead what the alleged serious medical need was (e.g., whether it was medical care to prevent his death, suicide prevention, or both).[12]  Nonetheless, construing Plaintiffs' SAC in the light most favorable to Plaintiff, the Court assumes for purposes of evaluating Defendants' Motion, that Plaintiffs alleged a serious medical need (whatever that need may be).

### 2.  *Deliberate Indifference*

"Upon demonstration of a serious medical need, the plaintiff must then show that the defendant's response was deliberately indifferent." *J.K.J. v. City of San Diego*, No. 19-CV-2123-CAB-RBB, 2020 WL 738178, at *6-8 (S.D. Cal. Feb. 13, 2020) (Bencivengo, J.) (citing *Edmo*, 935 F.3d at 785).  Thus, "[a] § 1983 action premised on violation of the

---

[12]    Defendants argue that "Plaintiffs admitted that the medical need at issue was NOT Mr. Boulanger [sic] heightened risk of suicide," Mot. at 13:4-5, citing to Plaintiffs' Opposition to Defendants' Motion to Dismiss and Strike the First Amended Complaint, ECF No. 34 at 17:9-12; however, in Plaintiffs' Opposition, ECF No. 34 at 17:9-12, Plaintiffs state that "[t]he serious medical need in this case is Boulanger's suicide attempt." That the serious medical need is even a point of contention indicates the inadequacy of the SAC, despite it being Plaintiffs third attempt at pleading the claims at issue in this case.

-22-

Fourteenth Amendment for inadequate medical care requires allegations that each defendant acted with deliberate indifference to the decedent's serious medical needs." *Scalia v. Cty. of Kern*, 308 F. Supp. 3d 1064, 1072 (E.D. Cal. 2018).

"Because pretrial detainees' rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment," courts "apply the same standards." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998); *Scalia*, 308 F. Supp. 3d at 1072. "Deliberate indifference is a high legal standard," *Toguchi v. Chung*, 391 F.3d 1041, 1060 (9th Cir. 2004), involving an examination of two elements: "(1) the seriousness of the prisoner's medical need and (2) the nature of the defendant's response to that need," *McGuckin*, 974 F.2d at 1059. "A defendant is deemed 'deliberately indifferent' to a substantial risk of serious harm when he knew of the risk but disregarded it by failing to take reasonable measures to address the danger." *Castro v. Cnty. of Los Angeles*, 797 F.3d 654, 666 (9th Cir. 2015). "[M]ere indifference [or] negligence . . . is not enough to constitute deliberate indifference." *Edmo v. Corizon, Inc.*, 949 F.3d 489, 495 (9th Cir. 2020). "Even gross negligence is insufficient to establish deliberate indifference." *Id.*

With respect to pre-trial detainees, like Mr. Boulanger, in 2018, the Ninth Circuit announced "that claims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard." *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018), *cert. denied sub nom. Cty. of Orange, Cal. v. Gordon*, 139 S. Ct. 794 (2019) (citing *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016)); *cf. Narcisse v. Tafesse*, No. 5:16-CV-00682-EJD, 2019 WL 4417635, at *5 (N.D. Cal. Sept. 16, 2019) (holding that *Gordon* focused only on the requisite state of mind for a defendant's conduct and did not eliminate the requirement that plaintiffs also show the existence of a serious medical need). Under this objective standard, "the elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment" require a plaintiff to prove (1) the defendant officer made an intentional decision with respect to the conditions under

which the detainee was confined; (2) "those conditions put the plaintiff at substantial risk of suffering serious harm"; (3) "the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious"; and (4) "by not taking such measures, the defendant caused the plaintiff's injuries." *Gordon*, 888 F.3d at 1125; *see also* Mot. at 12:6-15 (citing the objective standard under *Gordon*); Oppo. at 21:4-11 (same).

As analyzed below, the Court finds that Plaintiffs' SAC fails to plead facts sufficient to create a plausible claim that Defendants' were deliberately indifferent under any of the *Gordon* factors.

> a. <u>*Intentional decision with respect to conditions of confinement*</u>

The first factor requires the Court to determine Defendants acted intentionally with respect to Mr. Boulanger's conditions of confinement. *Gordon*, 888 F.3d at 1125. "For instance, if the claim relates to inadequate monitoring of the cell, the question is whether the officer chose the monitoring practice, rather than having just suffered an accident or sudden illness that made him unable to monitor the cell." *Germaine-Mciver v. Cty. of Orange*, No. SACV 16-01201-CJC(GJSx), 2018 U.S. Dist. LEXIS 223891, at *26-27 (C.D. Cal. Oct. 31, 2018). Further, "[l]iability under § 1983 must be based on the personal involvement of the defendant." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (providing that "[a] plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights").

Plaintiffs' SAC conclusorily alleges that "Defendant deputies acted intentionally or with reckless disregarded, [sic] denied, delayed, and/or interfered with Richard Boulanger's receipt of medical care" and "failed to properly conduct cell checks required to verify an inmate's safety and welfare." SAC at 27:15-20. These conclusory allegations fail to plead facts sufficient to create a plausible claim that Defendants intentionally chose the conditions of confinement (e.g., improper shift counts and muting the intercom). First, the SAC itself is inconsistent as to whether Deputy Dixon or Deputy Parent muted the

-24-

intercom system. Given these inconsistencies showing it is unclear who actually muted the intercom system, the allegations that Deputy Dixon intentionally muted it become implausible, or at a minimum, must be disregarded. *Compare* SAC at 11:22-25 *with* SAC at 14:4-20; *see also Sprewell*, 266 F.3d at 988–89 (holding that plaintiffs may plead themselves out of a claim by including details contrary to their claims); *Ileto v. Glock Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003) (noting that courts "do not accept any unreasonable inferences or assume the truth of legal conclusions cast in the form of factual allegations.")

Second, as to Deputy Reyes, Plaintiffs conclusorily allege that he "was deliberately indifferent to the medical needs of Boulanger, in that his approximate 1 second 'check' [sic] sufficient to verify 3 inmates wellbeing." SAC at 19:5-8. However, Plaintiffs never make any sort of allegation to indicate that Deputy Reyes' less than thorough shift counts were the result of an intentional decision rather than mere or even gross negligence or oversight. *Edmo*, 949 F.3d at 495.

Third, to the extent Plaintiffs attempt to allege that Defendants knowingly delayed medical care to Mr. Boulanger, Defendants correctly note that "[d]eputies cannot be deliberately indifferent to a medical need that is hidden or unknown." Mot. at 14:27-28. There is no suggestion in the SAC (at least not a plausible one) that Deputy Defendants knew Mr. Boulanger was attempting suicide and deliberately ignored him or intentionally chose to sit on their hands and wait before rendering aid to him. Instead, the SAC alleges that within a half hour Deputies Pacheco and Germain "randomly discovered" Mr. Boulanger during an opening shift count. *See* SAC at 10:21-24. Further, upon discovering Mr. Boulanger, they notified Deputy Dixon, who was working at the watchtower, by radio that Mr. Boulanger had hung himself. *Id.* at 8:21-23, 9:1-4, 11:14-21; ECF No. 35-1 at 14. They also rendered aid to him, even temporarily reviving him. SAC at 9:1-6.

The allegations of the SAC make implausible any conclusion that the muting of the intercoms or less than thorough soft counts was intentional (rather than negligent), much less intended to specifically allow Mr. Boulanger to commit suicide and/or delay his medical care if he attempted to do so. In sum, the Court agrees that "the SAC lacks any

-25-

[plausible] allegations that deputy defendants intentionally denied or delayed Mr. Boulanger access to medical care." Mot. at 13:19-20. Thus, the SAC fails to plead facts creating a plausible claim that Defendants' intentional conduct, rather than mere negligence, caused Decedent's harm.

        b.    *Conditions of confinement placed the inmate at substantial risk of suffering serious harm.*

    As to the second factor, the SAC also fails to allege the time Mr. Boulanger died, and as a result, fails to plead that the confinement conditions (e.g., improper soft counts and muted intercoms) put Mr. Boulanger at a substantial risk of harm because it fails to establish they were present at the time of his death. *Gordon*, 888 F.3d at 1125. For instance, even if Deputy Reyes' soft counts were inadequate, if Mr. Boulanger attempted suicide after those inadequate checks when another deputy was on duty, then, even if Deputy Reyes' checks were improper, they did not put Mr. Boulanger at a substantial risk of suffering.

    "Although an inmate is required to show awareness of the risk, 'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Cotta v. Cty. of Kings*, 79 F. Supp. 3d 1148, 1162 (E.D. Cal. 2015), *on reconsideration in part*, No. 1:13-CV-359-LJO-SMS, 2015 WL 521358 (E.D. Cal. Feb. 9, 2015), *aff'd in part, rev'd in part*, 686 F. App'x 467 (9th Cir. 2017). For example, where "an inmate presents evidence of very obvious and blatant circumstances indicating that the prison official knew the risk existed, then it is proper to infer that the official must have known of the risk." *Id.* (internal quotations omitted).

    Defendants correctly argue that "[p]rior to the man down call, there is no allegation that any of the individual defendants in this case had any interaction with or information about Mr. Boulanger." Mot. at 13:10-11; *see also* SAC. If none of the Deputy Defendants had an individual encounter with Mr. Boulanger, there is no reason to suspect they could possibly be aware of his suicide risk. Defendants also point out that the "SAC does not suggest that Mr. Boulanger had any known history of suicide attempts or ideations." Id. at

13:14-15. Instead, the SAC merely alleges that "San Diego jail staff employees are aware that white, male, opiate users that are incarcerated while detoxing are known to be an extremely high risk of suicide." SAC at 15:9-14. A general awareness of the high risk of suicide in a certain population in no way imputes knowledge that a specific defendant was at risk of committing suicide. *See Neil Through Cyprian v. Modesto City Sch. Dist.*, No. 1:17-CV-0256-LJO-SKO, 2017 WL 4652744, at \*4-6 (E.D. Cal. Oct. 17, 2017) (holding that generalized knowledge concerning suicide in schools was insufficient to establish knowledge of a substantial risk of serious harm against school district defendants after a student committed suicide). To take matters even further, Plaintiffs' premise that knowledge should be imputed to Deputy Defendants—because they should know white, male opiate users are at an increased risk of suicide—fails to create a plausible claim for relief because the SAC fails to allege anywhere that any of the individual Deputy Defendants knew Mr. Boulanger was a drug user. *See generally* SAC. Even though Plaintiffs allege Mr. Boulanger's drug use was revealed in the booking process, Plaintiffs never allege any of the individual Deputy Defendants were involved in the booking process. SAC at 7:24-8:2. Further, even if Plaintiffs had alleged that Deputy Defendants knew Mr. Boulanger was an opiate user and had a history of mental illness, that alone would still not impute knowledge upon them that Mr. Boulanger was a suicide risk. *See, e.g., Moriarty*, 2019 WL 4643602 at \*7 (reiterating that knowledge an inmate "is suffering from mental problems more generally does not meant that officials are constitutionally required to anticipate and guard against suicide"). Absent an allegation that any of the Deputy Defendants had any reason to know Mr. Boulanger had a heightened risk of committing suicide, this Court finds that it is implausible to conclude that they (1) somehow disregarded a known risk Mr. Boulanger would commit suicide, (2) intentionally chose to turn off the intercom system and/or perform proper proof of life checks to allow Mr. Boulanger time and space to commit suicide, and/or (3) intentionally delayed rendering medical care in the hopes that Mr. Boulanger would succeed in his suicide attempt. As Defendants point out, the gist of Plaintiffs' SAC comes down to an allegation that "five

jail deputies, one jail lieutenant, and even the Sheriff himself" violated the Constitution and caused "Mr. Boulanger to hang himself." Mot. at 8:11-13. While the muting of the intercoms coupled with Deputy Reyes less than thorough soft counts was unfortunate, it is still unclear to this Court that Deputy Reyes' soft counts occurred during Mr. Boulanger's suicide attempt and/or contributed to causing it.

Plaintiffs contend that "[t]he objective reality Defendants refuse to acknowledge is: Boulanger was improperly housed on intake" because "before his suicide, Boulanger's friends called the jail to inform them he was a suicide risk (he told friend [sic] he would kill himself if he had to go back because he had been orally raped in prison before), which the County ignored." Oppo. at 25:5-11. In their Reply brief, Defendants correctly point out that Plaintiffs' sudden argument that Mr. Boulanger's friends called the jail to warn of a suicide risk is not in the complaint and cannot cure an insufficient pleading. Reply at 3:23-4:8 (quoting *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss. ... The focus of any Rule 12(b)(6) dismissal—both in the trial court and on appeal—is the complaint.")). "More importantly, Plaintiffs have not alleged (or even stated in their opposition) that this purported call to the jail was made known to any Defendant in this case." Reply at 4:6-8. Allowing a plaintiff to escape a motion to dismiss by suddenly alleging new facts in opposition to a motion to dismiss that the plaintiff had failed to plead in the three complaints on file would not only be improper but also prejudicial.[13]

---

[13] Plaintiffs also allege that "[o]nce discovered and taken out of his cell, deputies went to use an AED defibrillator to revive Boulanger[, b]ut, the jail did not properly maintain their emergency equipment, such as AED defibrillators, and when they went to use it, it would not work." Oppo. at 23:28-24:3 (citing SAC at ¶ 77). However, the entirety of paragraph 77 of the SAC cited by Plaintiffs for this allegation merely alleges that: "40 inmates have died by suicide in San Diego County jails since 2009." As such, the paragraph cited by Plaintiffs contains no such allegations and does not stand for what Plaintiffs say it does. Further, even if the Court considered allegations regarding the

-28-

Plaintiffs argue that "[t]his court has already ruled that failure to perform a proper counting procedure is deliberately indifferent as well."   Oppo. at 23:15-18 (citing *Victorianne v. County of San Diego,* Case No. 14cv2170 WQH, Dkt. 151, page 37, lines 3-22).   However, in *Estate of Victorianne v. Cty. of San Diego*, No. 14CV2170 WQH (BLM), 2016 WL 411292, at *5 (S.D. Cal. Feb. 3, 2016) (Hayes, J.), an inmate was found dead in his cell seven days after ingesting large amounts of methamphetamine, had been hospitalized after his arrest but before being booked, and had been under medical treatment during his incarceration.   Prison policy required "deputies to receive verbal or physical acknowledgment from an inmate who might be in medical distress." *Id.* at *5.   However, when two officers came in to serve a meal, one officer told another officer, "The guy's not moving," to which the other responded, "Okay, he twitched," at which point the officers left the tray of food, closed the door, and left. *Id.*   The inmate was found dead in his cell three hours later. *Id.*   As a result, the court denied the motion to dismiss for deliberate indifference to serious medical needs where the inmate was not moving, and the officers left the cell. *Id.* at *21.   However, not only is *Victorianne* not binding on this Court, but it

defibrillator, "neither a public entity nor a public employee is liable . . . for failure to provide sufficient equipment, personnel or facilities therein." CAL. GOV'T CODE § 845.2. As such, at least with respect to Plaintiffs' state law claims, Defendants cannot be held liable for inadequate maintenance of the defibrillator as a matter of law.

Plaintiffs also conclusorily argue that "Boulanger had a serious medical need and was denied medical treatment when booked, after booked when his friends called the jail, during his suicide by ignoring the pleas for help, and after the deputies discovered him and tried to use a broken AED on him." Oppo. at 24:7-10. Again, the SAC, contrary to Plaintiffs' allegations does not allege that (1) when Mr. Boulanger was booked, he was denied medical treatment—on the contrary, it alleges he was given medication for withdrawal; (2) Mr. Boulanger's friends called the jail; (3) during his suicide, he pled for help; or (4) the AED was broken. Accordingly, these facts are not considered by the Court when ruling on Defendants' motion to dismiss. *Schneider*, 151 F.3d at 1197 n.1. Further, even if the Court did consider such allegations, Plaintiffs fail to argue any of these actions were done intentionally. Absent intentional conduct, there is no deliberate indifference. *Edmo*, 949 F.3d at 495. Thus, even if the Court permitted leave to amend to include those allegations, those allegations would still not save the subsequent complaint.

is also inapposite and in no way created a bright line rule that soft counts of one second or less always show deliberate indifference.   More importantly, unlike the officers in *Victorianne*, who performed cursory soft counts despite knowing the inmate was on medical watch, based on the SAC, Deputy Defendants had no reason to suspect Mr. Boulanger was at risk of suicide when Deputy Reyes performed his short soft counts.

Defendants argue Plaintiffs have not sufficiently alleged any of the Deputy Defendants had any reason to suspect that Mr. Boulanger intended to harm himself." Reply at 4:9-10.  The Court agrees that as pled, the SAC does not allege Deputy Defendants had any reason to suspect that the conditions of confinement they created put Mr. Boulanger a substantial risk of serious harm.  For instance, Plaintiffs allege that during the soft count at approximately 5:25 p.m., video surveillance shows Deputy Reyes "walking up to each cell and peering in for approximately 1 second before proceeding to the next cell."  SAC at 17:18-21.  However, Plaintiffs fail to plead that Deputy Reyes' cursory examination of the cells was unwarranted: For example, Sheriff's Detention Policy I.43 only required "detentions staff to verify 'each inmate's well-being through verbal or physical acknowledgement from the inmate."  *Id.* at 15:28-16:5.  Thus, the fact that video surveillance shows Deputy Reyes merely "peering in for approximately 1 second before proceeding to the next cell," *id.* at 17:18-21, does not necessarily mean the checks were inadequate, or that proof of life was not obvious, even from 3-4 feet away, such as where the inmates in those cells may have been moving around and obviously alive.  It is also not unreasonable to imagine a scenario where the inmates, being accustomed to these checks and seeing the officer walking through the corridors to do them, might give the officer a physical gesture, such as a wave, to provide the requisite physical acknowledgement of their well-being.  For purposes of this Motion, the Court refrains from speculating that this was the case.  However, as pled, Plaintiffs' SAC shows that Mr. Reyes did, in fact, perform the checks and fails to plead sufficient facts to indicate that the checks were inadequate. While the Court, when ruling on a motion to dismiss, must liberally construe all allegations in a plaintiff's favor as well as draw all reasonable inferences in the light most favorable

to the non-moving party, *Manzarek*, 519 F.3d at 1031, construing the allegations in the SAC as showing "a substantial risk of harm" exceeds the scope of drawing all reasonable inferences and crosses the line into making assumptions on Plaintiffs' behalf.

Thus, even though the SAC fails to plausibly allege the conditions of confinement at issue were intentional, even if it did, Deputy Defendants would not have reason to suspect that cursory checks or muting the intercom would create a substantial risk that Mr. Boulanger would attempt suicide.

c.   *Failure to take reasonable available measures to abate the risk when a reasonable official would have done so*

With respect to the third *Gordon* factor, the SAC also fails to plausibly allege that Deputy Defendants did not take reasonable measures to abate the risk that Mr. Boulanger might not receive prompt medical care "even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious." *Gordon*, 888 F.3d at 1125. Again, Defendants argue that "[n]o reasonable official under these circumstances would have appreciated that Mr. Boulanger was at a high risk of suicide." Mot. at 15:24-25. Defendants elaborate that "it does not matter that Deputy Dixon failed to hear the intercom because it was muted or that Deputy Reyes' cell check did not last a little longer than it did" because "[n]either of them knew or had reason to suspect that Mr. Boulanger had a heightened risk of suicide or was suffering from any other serious medical need." *Id.* at 15:25-16:1. Defendants argue that "[t]o allow Plaintiffs to proceed with this claim under these circumstances would turn deliberate indifference into strict Constitutional liability anytime there is a jail suicide." *Id.* at 16:1-4. Meanwhile, Plaintiffs conclusorily argue, "We know that muting the emergency intercom system was objectively unreasonable." Oppo. at 21:27-28.[14]

[14]   Plaintiffs also noted that "Defendants['] expert Robert Fonzi recently testified under oath that muting the system was not reasonable." Oppo. at 22:3-4. Again, this is improper information for the Court to consider when determining a motion to dismiss as it was not

"With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case." *Gordon*, 888 F.3d at 1125 (internal quotations omitted). "The mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Id.* (quoting *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986)). Thus, the plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* "An *inadvertent* failure to provide adequate medical care does not, by itself, state a deliberate indifference claim for § 1983 purposes." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (emphasis in original) (quotation marks omitted). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

For instance, in 2010, in *Conn v. City of Reno*,[15] the Ninth Circuit held the officers had been deliberately indifferent where a woman committed suicide after the officers had reason to suspect she was a suicide risk. 591 F.3d at 1090. In *Conn*, while transporting a detainee "to civil protective custody, two Reno police officers witnessed her wrap a seatbelt around her neck in an apparent attempt to choke herself and then scream that they should kill her or else she would kill herself." *Id.* at 1090. "The officers failed to report the incident to jail personnel or take her to a hospital," and the woman was released from protective custody a few hours later. *Id.* at 1090-91. However, the next day, the police detained the woman on a misdemeanor charge, and less than 48 hours after the suicide threats, she "hanged herself in her cell." *Id.* at 1091. The court held "that, on the facts presented, a reasonable jury could find that the defendant police officers are liable under 42 U.S.C. § 1983 for their deliberate indifference to Clustka's serious medical need, and that

---

alleged in the SAC. As such, the Court disregards this when ruling on this Motion. However, under *Gordon*, unreasonable actions do not *per se* show deliberate indifference.

[15] Although *Conn* was before the Ninth Circuit's decision creating the objective standard for deliberate indifference under the *Gordon* factors, *Conn*'s analysis on deliberate indifference is helpful nonetheless.

-32-

their actions were a cause in fact and a proximate cause of her suicide." *Id.* at 1091.

On the other hand, in 2019, the Ninth Circuit reversed the district court's denial of qualified immunity to an officer in *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 601 (9th Cir. 2019), determining that based on the facts as well as the law at the time of the incident, including *Conn*, "a reasonable officer would not have known that failing to attend to Horton immediately would be unlawful." *Id.* at 601. In *Horton*, an eighteen-year-old boy's mother, acting as guardian ad litem, also filed suit alleging (1) negligence, (2) Section 1983 liability on the part of the officers, (3) liability on the part of the municipal defendants under *Monell*, and (4) liability under California Government Code, § 845.6 on the part of all defendants. *Id.* at 598. The plaintiff's son had been arrested, taken to the local police department, and detained in a temporary holding cell. *Id.* at 596. Even though the officer knew he was a suicide risk, he left the detainee unattended for approximately a half hour while he spoke with the detainee's mother and completed paperwork. *Id.* at 596. In that time, the detainee "removed his belt, fed it through the cell door bars, and hanged himself, causing permanent and severe damage." *Id.* As stated, the Ninth Circuit determined that based on the facts as well as the law at the time of the incident, including *Conn*, "a reasonable officer would not have known that failing to attend to Horton immediately would be unlawful." *Id.* at 601.

Similarly, in 2020, this district court held that two police officers had not been deliberately indifferent under the *Gordon* factors in *J.K.J. v. City of San Diego.* 2020 WL 738178 at *8. The *J.K.J.* detainee had been arrested and started vomiting while in the patrol car on the way to the police station. *Id.* at *1. When the officers asked if she was suffering from withdrawal, she told them she was sick and pregnant. *Id.* As a result, the officers did not take the woman to a hospital, took her fingerprints, and then, placed her back into the patrol car. *Id.* at *2. When they returned to check on her, the officer could not verify if the woman was breathing and summoned medical attention. *Id.* Unfortunately, the woman went into a coma and died. *Id.* In granting the defendants' motion to dismiss the complaint, the Court evaluated the second *Gordon* factor and

-33-

determined that the complaint did "not adequately allege a serious medical need based on what any of the officers knew at the time." *Id.* at *7. Instead, the detainee's "vomit and pleas for help, without more, and particularly in light of [her] . . . statement that the vomit was the result of a pregnancy and illness, would not have caused a reasonable officer in the circumstances to have appreciated that there was a high degree of risk in not taking her to a hospital or calling an ambulance." 2020 WL 738178 at *8. "Only with the 20/20 vision of hindsight based on the tragic outcome could it be found that a reasonable officer . . . would have known that, assuming the truth of all of the factual allegations about Jenkins' condition during the traffic stop and on the ride to police headquarters, proceeding to the station instead of to a hospital would have obvious serious medical consequences." *Id.* Thus, the Court found that the complaint also failed under the third *Gordon* factor, and therefore, did not state a claim for denial of medical care in violation of Fourteenth Amendment Due Process rights. *Id.*

Here, the SAC pleads that Decedent (1) was arrested for a non-violent crime, SAC at 7:21-23; (2) was a known opiate user and was suffering from withdrawal symptoms, *id.* at 7:21-23; (3) tested positive for narcotics, including cocaine and heroin; (4) told staff he used heroin and drank alcohol on a daily basis; (5) was observed as experiencing withdrawal symptoms; (6) was noted as having a history of mental illness; and (7) was provided medication for his withdrawal symptoms, *id.* at 7:24-8:3. The SAC also alleges that "Defendant deputies knew or should have known" (1) Mr. Boulanger "faced a serious medical and/or mental health need while at San Diego County Central Jail," *id.* at 25:25-28; (2) Mr. Boulanger "was a heroin addict who had taken opiates less than 24 hours before his booking," *id.* at 26:1-2; (3) Mr. Boulanger had a "condition [that] was serious, and that he was in significant pain, and that failure to promptly treat his noose injury could result in further significant injury and unnecessary and wanton infliction of pain," *id.* at 27:7-11; (4) Mr. Boulanger "was in medical distress," *id.* at 27:21-23; (5) "that a significant number of inmates booked in Central Jail suffered from drug intoxication," *id.* at 28:1-3; (6) "that the policies they had implemented with respect to medical care of inmates suffering suicide

attempts was grossly inadequate," SAC at 28:4-7; and (7) "of the disproportionately high number of deaths in San Diego County Jails," *id.* at 28:8-10. However, the SAC never pleads facts making it plausible that Deputy Defendants were made aware of any of the aforementioned facts. Without facts showing, for example, that one of the Deputy Defendants performed the booking, or that all deputies are informed of every fact learned during booking by the officer doing the booking, the aforementioned allegations are nothing more than the conclusory allegations *Twombly* holds insufficient.

As a comparison, in both *J.K.J.* and *Horton*, the courts did not find deliberate indifference even though in *J.K.J.*, the officers knew the detainee had some medical needs (e.g., had been vomiting), 2020 WL 738178 at *7-8, and in *Horton*, the officer had been informed the detainee was suicidal, 915 F.3d at 601. Further, unlike *Conn*, where the court found deliberate indifference after the detainee had previously attempted suicide in front of officers, was arrested again, and hanged herself in the cell, 591 F.3d at 1090-91, the SAC has no allegations that Deputy Reyes or Deputy Dixon knew Mr. Boulanger had any medical issues or even know of his withdrawal or mental health issues. Thus, if the officers in *J.K.J.* and *Horton* were not held liable for detainee suicides despite knowledge of some level of medical risk, this Court finds that in the absence of facts pleading the individual deputies knew Mr. Boulanger had any level of risk, the SAC's claim for relief is not plausible. Accordingly, beyond their conclusory allegations that Defendants acted with deliberate indifference, the SAC fails to set forth any specific allegations as to (1) what reasonable available measures to abate the risk of suicide Deputy Defendants should have taken; (2) whether reasonable officers would have taken those reasonable available measures; and/or (3) if Deputy Defendants had taken such reasonable available measures, it would have prevented the harm to Mr. Boulanger.

> d. *Failure to take reasonable available measures caused the injuries.*

Plaintiffs conclusorily allege that "[t]he failures of Reyes were a significant cause of the delay in discovering Boulanger's suicide attempts and a proximate cause of his death," SAC at 19:1-3, and "[a]s a direct and proximate result of all Defendants' conduct, Richard

1    Boulanger experienced physical pain, severe emotional distress, and mental anguish, as
2    well as loss of his life and other damages alleged herein," *id.* at 28:25-28.

3          Defendants argue that "[e]ven assuming for the sake of argument some suicidal risk
4    was known to the deputies, Mr. Boulanger's decision to take his own life is a superseding
5    cause that broke the chain of causation." Mot. at 17:17-28 (citing *Lucas v. City of Long*
6    *Beach*, 60 Cal.App.3d 341, 351 (1976)).  Plaintiffs argue that "Defendant Deputies[']
7    decision to interfere, deny, and delay medical care was a substantial factor in causing
8    Boulanger's suffering  and death." Oppo. at 24:22-24.  Again, the SAC fails to allege
9    sufficient facts to show that the any delay in medical care was the result of any intentional
10   decision by Deputy Defendants.

11         Defendants also correctly point out that although Plaintiffs allege that Deputy Parent
12   "had knowledge of Boulanger's serious medical needs," they not only fail to allege any
13   facts to make such an allegation plausible but also allege that it was Deputy Dixon in the
14   tower when Mr. Boulanger's cellmate activated the intercom.  Mot. at 13:21-27 (citing
15   SAC, ECF No. 55 at ¶¶ 37, 52).  If Deputy Parent was not even in the cell tower at the time
16   medical care was allegedly delayed, how he could have delayed medical care (much less
17   intentionally done so) is unclear at best.   *See, e.g., Arnold v. Int'l Bus. Machines Corp.*,
18   637 F.2d 1350, 1355 (9th Cir. 1981) (providing that the "[t]he requisite causal connection
19   can be established not only by some kind of direct personal participation in the deprivation
20   but also by setting in motion a series of acts by others which the actor knows or reasonably
21   should know would cause others to inflict the constitutional injury") (citing *Johnson v.*
22   *Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

23         Plaintiffs respond that Mr. Boulanger would not have suffered and died but for
24   Defendants' (1) "failure to provide medical care" and (2) "muting and unplugging speakers
25   in the watch tower, ignoring flashing red light, and ignoring, the distress pleas for urgent
26   medical assistance."   Oppo. at 24:24-25:1. They elaborate that "[t]he objective reality
27   Defendants refuse to acknowledge is: Boulanger was improperly housed on intake; . . .
28   REYES did not properly check on Boulanger; [and] DIXON ignored everything." *Id.* at

25:5-11.

Conspicuously absent from Plaintiffs' SAC is an allegation at what time Mr. Boulanger (1) made his suicide attempt and (2) was discovered by deputies. Plaintiffs make numerous allegations about when the soft counts were done and whether they were done properly. However, if the soft counts were done improperly, but those improperly done soft counts occurred before Mr. Boulanger's attempts, then, even if the soft counts had been performed properly, they would not have had an impact on Mr. Boulanger's suicide attempt. Plaintiffs' SAC similarly fails to allege the time period during which the intercom was muted, although it is pled that it was muted while Mr. Boulanger made his suicide attempt. *See* SAC at 8:27-28 (pleading that "[n]o one in the jail answered these calls either because defendant deputy DIXON in the control tower muted all inmate alerts and calls").

Thus, the primary allegations arise from Deputy Reye's failure to perform long enough cell checks and the muting of the intercom (although it is unclear who muted it). However, the focus of a Section 1983 action "is on whether a reasonable officer would have known that the deputies' conduct violated" an inmate's federal statutory or constitutional rights rather than a prison policy. *See, e.g., Case v. Kitsap Cty. Sheriff's Dep't*, 249 F.3d 921, 929 (9th Cir. 2001). Thus, even where deputies violate a prison policy—such as the allegations that Deputies Reyes and Dixon violated prison policy regarding the intercom and soft counts, the violation of a prison policy does not *per se* give rise to liability under Section 1983. *See id.* at 930 (citing *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir.1997) (holding that the defendants were entitled to qualified immunity because "there is no § 1983 liability for violating prison policy"; rather, a plaintiff "must prove that [the official] violated his constitutional right")). Here, while Plaintiffs' SAC includes general conclusory allegations of violation of constitutional rights, the facts supporting those allegations do not give rise to a plausible claim that Deputy Defendants were deliberately different. At best, their alleged conduct amounts to mere negligence, which fails to establish a Section 1983 claim. *See, e.g., Castro*, 833 F.3d at 1071 (noting

-37-

1   that the Supreme Court has instructed that "mere lack of due care by a state official" does

2   not "'deprive' an individual of life, liberty, or property under the Fourteenth

3   Amendment."); *see also Daniels v. Williams*, 474 U.S. 327, 329–30 (1986) (concluding "in

4   any given § 1983 suit, the plaintiff must still prove a violation of the underlying

5   constitutional right; and depending on the right, merely negligent conduct may not be

6   enough to state a claim").

7        Plaintiffs cite various cases[16] to support the argument that "[t]he Ninth Circuit has

8   found, [sic] 'access to medical staff is meaningless unless that staff is competent and can

9   render competent care.'" Oppo. at 22-23. The Court does not dispute Plaintiffs' contention

10

11   [16]    Plaintiffs attempt to establish deliberate indifference here by citing to a number of
cases that in no way factually resemble this case. *See, e.g.*, Oppo. at 22-23 (citing *Lopez*
12   *v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2001) (holding that deliberate indifference had been
13   established where an inmate, although receiving some medical treatment, was denied his
full caloric requirements and was not provided with follow-up appointments); *Caldwell v.*
14   *Bannister*, 763 F.3d 1060 (9th Cir. 2014) (finding deliberate indifference had been
15   established where an inmate was provided optometry appointments but was denied cataract
surgery because he had one good eye); *Snow v. McDaniel*, 681 F.3d 978, 986 (9th Cir.
16   2012) (holding that medical staff was deliberately indifferent to a prisoner's serious
17   medical needs by denying him a hip surgery even though he was provided medical care
and pain medications); *Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 1999)
18   (holding plaintiff had pled a claim for deliberate indifference when a prisoner receiving
19   mental illness medication was not given the medication upon release from incarceration
because a prison official ignored the instructions of the prisoner's treating physician);
20   *Jackson v. McIntosh*, 90 F.3d 330 (9th Cir. 1996) (holding the issue of deliberate
21   indifference triable when jail doctors denied a kidney transplant for an inmate on dialysis);
*Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) (holding medical staff
22   deliberately indifferent when they prescribed an inmate sedatives despite knowledge that
23   the inmate had suffered a head injury and the inmate was exhibiting complications that had
been indicated on his medical chart)). In all of these cases, the inmates had received
24   previous medical treatment, meaning the prison-staff knew of a medical need. However,
25   this case does not involve medical staff. Further, none of the cases cited by Plaintiffs hold
that prison staff is deliberately indifferent by failing to check on an inmate more frequently
26   than every half hour or checking on them for more than a few seconds when the prison
27   official had no specific knowledge the inmate was at risk of suicide. None of these cases
hold that an inadvertent delay in medical care constitutes deliberate indifference. As such,
28   these cases do not save Plaintiffs' inadequately pled claims.

1    that "[d]eliberate indifference may be demonstrated when prison officials 'deny, delay or

2    intentionally interfere with medical treatment.'" *Id.* at 23:17-20. However, again, the issue

3    here is that separate and aside from Plaintiffs' wholly conclusory allegations, the facts pled

4    do not plausibly indicate that any delay in medical care was intentional. Thus, beyond their

5    conclusory allegations that Defendants acted with deliberate indifference, the SAC fails to

6    set forth any specific allegations that any failure to render prompt medical care, perform

7    more thorough checks, or keep the intercom system unmuted was the result of deliberate

8    indifference. *Ashcroft*, 556 U.S. at 678, *citing Twombly*, 550 U.S. at 557.

9         "Causation is, of course, a required element of a § 1983 claim." *Estate of Brooks v.*

10   *United States*, 197 F.3d 1245, 1248 (9th Cir. 1999). Defendants argue that Plaintiffs accuse

11   Defendants of "causing Mr. Boulanger to hang himself." Mot. at 1:11-13. This Court

12   recognizes that "[s]uicide is the leading cause of death in jails, yet many jails and

13   municipalities have insufficient policies for preventing inmate suicide." Kyla Magun, *A*

14   *Changing Landscape for Pretrial Detainees? The Potential Impact of Kingsley v.*

15   *Hendrickson on Jail-Suicide Litigation*, 116 Colum. L. Rev. 2059 (2016). However,

16   generally, the law does not hold third parties liable for another person's intentional acts.

17   C.T. Drechsler, Annotation, *Civil Liability for Death by* Suicide, 11 A.L.R.2d 751

18   (Originally published in 1950) (noting that "[o]nly recently does any attempt appear to

19   have been made to hold a defendant civilly liable for causing suicide of another" while

20   "earlier cases seem to hold, as a matter of law, that suicide is an independent intervening

21   cause, so that there can be no liability for acts, whether done with intent to injure or

22   negligently, that cause suicide") (citing *Tate v. Canonica*, 180 Cal. App. 2d 898 (1960)).

23   Suicide, although certainly tragic, is undeniably an intentional act. *See Coleman v. Brown*,

24   No. CIV S-90-0520 KJM KJN PC, 2016 U.S. Dist. LEXIS 86352, at *82 (E.D. Cal. Mar.

25   29, 2016) ("A suicide attempt is an intentional act that is deliberately designed to end one's

26   own life"); *King v. United States*, 756 F. Supp. 1357, 1361 (E.D. Cal. 1990)

27   ("The intentional act of a third person is a superseding cause of harm and relieves the

28   original actor of liability unless such act was reasonably foreseeable or the failure to foresee

1    such act was a factor in the original negligence"); *Esurance Ins. Co. v. Streeter*, No. 2:19-

2    CV-2065-JAR-JPO, 2019 U.S. Dist. LEXIS 121419, at *7 (D. Kan. July 22, 2019)

3    ("suicide is an intentional act").  Only in rare cases can a person cause another individual

4    to take his or her life—such as exceptional cases where one encourages an individual to

5    commit suicide.[17]  Failure to hold one person liable for another person's suicide also stems

6    from the common law rule that there is no duty to rescue.  *See, e.g.*, *Verdugo v. Target

7    Corp.*, 770 F.3d 1203, 1222 (9th Cir. 2014) (providing that "as a general rule, an individual

8    or entity does not have a duty under the common law to come to the aid of another person

9    whom the individual or entity has not injured").

10          For example, in a similar case, *Lucas v. City of Long Beach*, 60 Cal. App. 3d 341

11   (1976), "the defendant police department placed a teenage individual in a juvenile

12   detention center without supervision, in spite of their suspicion that he was under the

13   influence of drugs." *King*, 756 F. Supp. at 1361.  While the juvenile had been detained, he

14   committed suicide, but when the mother sued for wrongful death, the court found that

15   proximate cause was not established against the police. *Lucas*, 60 Cal. App. 3d at 351.  The

16   court held that "[t]he **intentional act** of a third person is a superseding cause of harm and

17   relieves the original actor of liability unless such act was reasonably foreseeable or the

18   failure to foresee such act was a factor in the original negligence." *Id.* at 351 (*citing* Rest.

19   2d Torts).  It "observed that 'the most that can be said concerning [the police's] negligence

20   is that it provided a greater opportunity than already existed for [the decedent to] act." *Id.*

21

---

22   [17]      For example, in *Commonwealth v. Carter*, 481 Mass. 352, 371, 115 N.E.3d 559, 574

23   (2019), a recent, highly publicized case, the Supreme Judicial Court of Massachusetts
     affirmed a judgment of involuntary manslaughter against the defendant, Michelle Carter,

24   finding that "[t]he evidence against the defendant proved that, by her wanton or reckless

25   conduct, she caused the victim's death by suicide."  The court reasoned that "an ordinary
     person under the circumstances would have realized the gravity of the danger posed by

26   telling the victim, who was mentally fragile, predisposed to suicidal inclinations, and in the

27   process of killing himself, to get back in a truck filling with carbon monoxide." *Id.* at 566.
     "[T]he defendant—the victim's girl friend, with whom he was in constant and perpetual

28   contact—on a subjective basis knew that she had some control over his actions." *Id.*

-40-

1    at 351.   The juvenile's "death, however, required the intervention of an additional

2    independent force, to wit, [his own] intentional act." *Id.* at 351.

3         Here, Mr. Cavanaugh seeks to hold the deputies, Sheriff, and County of San Diego

4    liable for his father's tragic, albeit, intentional act—his decision to commit suicide. *See*

5    *generally* SAC.  Had Mr. Cavanaugh's father died and been discovered immediately, there

6    would be no dispute as to a lack of liability.  However, regrettably, it took deputies between

7    10 to 30 minutes to discover Mr. Boulanger's distress.   SAC at 8-9.   When it was

8    discovered, they were able to revive Mr. Boulanger and transport him to a hospital where

9    he survived for two days before dying.  *Id.* at 8-9.  That Mr. Boulanger survived for two

10   days begs the questions of why it took so long to discover Mr. Boulanger and whether, if

11   he had been discovered earlier, he would have survived rather than died.[18]  In other words,

12   whether the failure to discover Mr. Boulanger and/or the delay in providing medical care

13   was an intervening and superseding cause in Mr. Boulanger's death.   Nonetheless, this

14   Court finds that this is not the rare case where any of the defendants "egged on" Mr.

15   Boulanger by encouraging him to commit suicide.    *See, e.g., Persampieri v.*

16   *Commonwealth*, 343 Mass. 19, 23, 175 N.E.2d 387, 390 (1961) (upholding the defendant's

17   murder conviction where after the defendant's wife threatened to commit suicide, he

18   taunted her by saying she was "chicken—and wouldn't do it," loaded a rifle, handed it to

19

20   [18]    The Court notes that in case before the United States Supreme Court, it was noted

21   that "cells in the cerebral hemispheres are destroyed if they are deprived of oxygen for as

22   few as 4 to 6 minutes." *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261,
     310, n.8 (1990) (citing Cranford & Smith, Some Critical Distinctions Between Brain Death

23   and the Persistent Vegetative State, 6 Ethics Sci. & Med. 199, 203 (1979)); *see also* 16

24   Am. Jur. 2d *Proof of Facts* § 87 (Originally published in 1978) (providing that "the human
     brain, deprived of its normal, oxygenated blood flow, dies in stages beginning first with

25   the cortex, the site of the highest centers involved with thinking, emoting, and

26   consciousness, and leads then to the brain stem, which controls respiration, heart rate, and
     blood pressure," but that "if the individual's brain is deprived of oxygen for five minutes,

27   there will be death in all probability to the cortex").  Thus, it appears that Mr. Boulanger

28   would have needed to be discovered in six minutes or less for it to have been probable that
     he would have survived.

-41-

her, and when she had difficulty firing the rifle, told her to take off her shoes and reach the trigger that way). Rather, Mr. Boulanger made the tragic, but intentional, decision to hang himself in his cell while his cellmate slept. SAC at 8:5-9. While the muting of the intercoms is suspicious, there is no allegation in Plaintiffs' SAC that this act was intended to allow for Mr. Boulanger's suicide and untimely discovery (e.g., there are no allegations it was done with the intent of either giving him time to commit suicide or hoping he would succeed if he tried by delaying medical care). As pled, without such an allegation, Deputy Dixon's actions amount to mere negligence, which is not enough to state a claim under Section 1983. There is also no allegation that when Deputy Reyes conducted the allegedly improper cell checks, that Mr. Boulanger was attempting or had attempted suicide, and thus, could have been discovered by Deputy Reyes if he had performed more thorough checks. As a result, the allegations against Deputy Reyes are also insufficient.

As pled, the SAC pleads the requisite elements for deliberate indifference, but those conclusory allegations, when read in conjunction with the facts of the complaint, fail to create a plausible claim for relief under the *Twombly/Iqbal* standard.

## C.   Plaintiffs' Third Claim for Relief for Loss of Familial Relationship Against Defendants Dixon, Reyes, Parent, and Kamoss

Plaintiffs' Third Claim for Relief alleges that Deputy Defendants "deprived Plaintiffs of their liberty interest in the companionship and society [of] one another," which "shocks the conscious and was a due process violation." SAC at 32:4-8.

Defendants argue that because there is no evidence suggesting Defendants acted with deliberate indifference, there are no "facts alleged against the deputies [that] 'shock the conscience'" required to establish a claim for loss of familial relationship. Mot. at 18:13-16. They also argue that "because Reyes and Dixson did not violate the Constitution, the claims against their supervisors fail as well." *Id.* at 8:22-25. Plaintiffs respond that the third claim for relief "is not duplicative of the deliberate indifference because it relates to rights and injuries suffered by different parties—Plaintiff Shane Cavanaugh, Richard Boulanger's son." Oppo. at 26:1-4. However, Plaintiffs' SAC fails to show deliberate

indifference *towards* Mr. Cavanaugh, as Mr. Boulanger's son.

"Substantive due process protects individuals from arbitrary deprivation of their liberty by government." *Villarreal*, 254 F. Supp. 3d at 1182 (citing *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006)). "A child's interest in her relationship with a parent is sufficiently weighty by itself to constitute a cognizable liberty interest." *Smith v. City of Fontana*, 818 F.2d 1411, 1419-20 (9th Cir. 1987), *overruled by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (holding that "the same allegation of excessive force giving rise to Mr. Smith's substantive due process claim based on his loss of life also gives the children a substantive due process claim based on their loss of his companionship").[19] Thus, "[p]arents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct." *Lemire v. Cal. Dept. of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013). This allows "[t]he child of an individual killed through state action [to] . . . assert a substantive due process claim based on their loss of companionship." *C. W. v. Asuncion*, No. 219CV02225RGKGJS, 2020 WL 2028531, at *4 (C.D. Cal. Mar. 16, 2020), *motion for relief from judgment denied sub nom. C. W. v. Asuncion*, No. 219CV02225RGKGJS, 2020 WL 4873565 (C.D. Cal. June 29, 2020) (citing

---

[19]    Courts must evaluate "whether the alleged interference with the children's protected liberty interest rises to the level of a substantive, as opposed to a procedural, due process violation." *Smith*, 818 F.2d at 1419. "[W]hether a particular interference with a liberty interest constitutes a substantive or a procedural due process violation depends on whether the interference was 'for purposes of oppression,' rather than for the purpose of furthering legitimate state interests." *Id.* (internal citations omitted). "When the state has a legitimate interest in interfering with a parent-child relationship, for example, where the best interest of the child arguably warrants termination of the parent's custodial rights, the state may legitimately interfere so long as it provides 'fundamentally fair *procedures.*'" *Id.* (citing *Kramer*, 455 U.S. at 754 (emphasis added)). "However, the state has no legitimate interest in interfering with this liberty interest through the use of *excessive* force by police officers." *Id.* at 1419-20. "Such an action constitutes the very sort of affirmative abuse of government power which the substantive protections of the due process clause are designed to prevent." *Id.* at 1420.

*Moreland v. Las Vegas Metropolitan Police*, 159 F.3d 365, 371 (9th Cir. 1998)). This right "derives from the decedent's constitutional rights." *Id.*

"The Ninth Circuit has stated that 'to establish a constitutional violation based on substantive due process, [a plaintiff] must show both [1] a deprivation of her liberty and [2] conscience-shocking behavior by the government.'" *Villarreal*, 254 F. Supp. 3d at 1182; *see also Asuncion*, 2020 WL 2028531, at *4. "Just as the deliberate indifference of prison officials to the medical needs of prisoners may support Eighth Amendment liability, such indifference may also rise to the conscience-shocking level required for a substantive due process violation." *Villarreal*, 254 F. Supp. 3d at 1182 (citing *Lemire*, 726 F.3d at 1075); *see also Kelson v. City of Springfield*, 767 F.2d 651, 654 (9th Cir. 1985), *overruled on other grounds by Smith*, 818 F.2d at 1419 (noting that "[t]he Supreme Court has repeatedly reaffirmed the existence of a constitutional right to the maintenance of a parent-child relationship"); *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008); *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998). As with claims for deliberate indifference to medical needs, children bringing Section 1983 claims for violation of their substantive due process right to the child-parent relationship may not establish their claims by alleging mere negligence. *Neil*, 2017 WL 4652744 at *4–6 ("Mere negligence or liability grounded in tort does not meet the standard for a substantive due process decision.") (citing *Lewis*, 523 U.S. at 848-49). "A Plaintiff can satisfy the 'shocks the conscience' standard either by (1) showing that a state official acted with 'deliberate indifference,' or (2) showing that a state official 'acted with a purpose to harm.'" *Id.* (citing *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)). "A [jail] official's deliberately indifferent conduct will generally 'shock the conscience' so as long as the [jail] official had time to deliberate before acting or failing to act in a deliberately indifferent manner." *Lemire*, 726 F.3d at 1075. However, "[t]here is no respondeat superior liability under section 1983." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to

-44-

act to prevent them." *Id.*

To demonstrate deliberate indifference to the risk of a suicide, a plaintiff must show: "(1) an unusually serious risk of harm, (self-inflicted harm in a suicide case), (2) defendants' actual knowledge of (or, at least, willful blindness to) that elevated risk, and (3) defendants' failure to take obvious steps to address that known, serious risk." *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996).

For example, in an analogous case involving a student suicide after expulsion from her school, the court dismissed a parent's claim and held that the student's parent had failed "to state a claim for a violation of substantive due process rights under the First and Fourteenth Amendments to a familial relationship with her daughter pursuant to § 1983." *Neil*, 2017 WL 4652744, at *4–6. In *Neil*, the parent alleged that the school's expulsion of her daughter had caused the daughter to commit suicide. *Id.* at *1. Although the court conceded the parent had standing to bring a substantive due process claim, it found the parent had failed to establish deliberate indifference. *Id.* The court noted that generally, courts conclude that a state's "failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at *5; *see also DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). Thus, "[b]ecause Defendants did not actually inflict the ultimate harm, Plaintiff must establish that defendants, as supervisors, acted with deliberate indifference in failing to prevent Neil's suicide." *Id.* at *5 (citing *Harry A. v. Duncan*, 234 Fed.Appx. 463, 465 (9th Cir. 2007)). However, the plaintiff's basis for alleging the defendants had knowledge, and therefore, acted with deliberate indifference was (1) an allegation of a warning from a friend a week prior and (2) conclusory statements that the defendant had some knowledge the student was suicidal and distraught, and therefore, knew she was more likely to commit suicide after harsh discipline. *Id.* at *6. The basis for this "generalized knowledge" was "warnings and publications contained in the California Department of Education website concerning suicide prevention in schools." *Id.* at *5. The court reasoned that generalized allegations in the SAC regarding knowledge from national studies and publications were

-45-

insufficient "to establish knowledge of 'unusually serious risk' of harm in this particular case." *Id.*

In *Villarreal v. Cty. of Monterey*, the sons of a deceased arrestee brought a lawsuit against, *inter alia*, the county, county sheriff, sheriff's deputies, and various doe defendants pursuant to Section 1983, alleging claims for failure to summon medical care, medical malpractice, battery, wrongful death, negligence supervision, and negligence. 254 F. Supp. 3d at 1184–86. In *Villarreal*, the police arrested the plaintiffs' mother after receiving calls reporting that she was walking in and out of traffic. *Id.* at 1174. At the time of booking, the arrestee "suffered from lacerations to her head, hands, and wrists." *Id.* She was placed in a safety cell, and plaintiffs allege she was not given medical attention, food, or more than a single cup of water over the next 28 hours. *Id.* While in the safety cell, she behaved erratically and yelled for help but was not provided medical attention. *Id.* The day after her arrest, she was found unresponsive in her cell covered in feces and moaning. *Id.* at 1175. A nurse notified a doctor, who told nursing staff to send the arrestee to the hospital for drug detoxification. *Id.* Unfortunately, the mother never regained consciousness and died two weeks later. *Id.*

The plaintiffs alleged that at the time of their mother's "arrest and death, the County had a policy of ignoring inmates' serious medical needs." *Id.* at 1185. The court determined that the plaintiffs had sufficiently pled "a policy or practice of providing inadequate medical care for inmates as they detoxify," and that "the County's deficient policies led to Decedent's death." *Id.* In doing so, the court noted that Plaintiffs had alleged that their mother "showed clear signs of drug withdrawal" that "were repeatedly ignored as were her direct pleas for help." *Id.* at 1185. It pointed out that "[d]rug withdrawal constitutes a serious medical need requiring appropriate medical care under the Eighth Amendment." *Id.* As a result, "the County's allegedly deficient screening and medication protocols for drug withdrawal 'may constitute deliberate indifference to a serious healthcare need.'" *Id.* Thus, the court concluded that "based on the allegations in the complaint, it was 'reasonably foreseeable' that the County's deficient policies for

managing opiate detoxification would lead to the alleged deficient treatment of . . . and subsequent death" of the plaintiffs' mother. *Id.* at 1185 (citing *Kwai Fun Wong v. United States*, 373 F.3d 952, 966 (9th Cir. 2004)).

Here, the Court agrees that if the Court concludes Mr. Boulanger's constitutional rights were not violated, as it has, Mr. Boulanger's son's claims for loss of his familial relationship with his father must also fail. Mr. Cavanaugh's allegations that Defendants knew Mr. Boulanger had a high risk of suicide largely stem from allegations of statistics regarding other jailhouse suicides. SAC at 20. These allegations are more akin to the allegations of general knowledge based on publications and other suicides like the *Neil* case, which the court found did not establish an unusually serious risk of harm. Further, unlike *Villarreal*, where the inmate behaved erratically at the time of arrest, had lacerations on her hands and wrists (which were likely indicative of previous suicide attempts), and yelled for help, here, the SAC is devoid of any allegations that any of the individually named defendants had a reason to suspect Mr. Boulanger specifically was at risk of suicide. In this claim for relief, Mr. Cavanaugh also alleges that "[t]here was no legitimate penological interest in denying access to medical care to an inmate in obvious medical distress leaving him hung in his cell, with deliberate indifference." SAC at 31:9-13. However, again, although the SAC alleges he was noted to be suffering from withdrawal and had a history of mental illness upon booking, *id.* at 7:24-8:2, there are no allegations the individually named defendants were privy to these facts. There are also no allegations that when Mr. Boulanger committed suicide, any of the individually named defendants knew he was in distress and simply left him there. On the contrary, the allegations of wrongful conduct arise out of claims that their negligence caused them to be unaware of the fact that Mr. Boulanger needed attention. Further, Mr. Cavanaugh alleges his father was denied access to medical care, SAC at 31:9-12, which is not plausible in light of the allegation that he was given medical care upon admission in the form of medication for withdrawal symptoms, *id.* at 8:1-2, as well as when deputies discovered him, which ultimately, resulted in him being revived, *id.* at 9:1-5. As pled, the SAC simply fails to

-47-

state a plausible claim for relief for loss of familial relationship.  Because the facts pled in the SAC and previous two complaints have also failed to create a plausible claim for relief, this Court finds that granting leave to amend would only prove to be an exercise in futility.

**D.**   **Plaintiffs' Fourth Claim for Relief for Failure to Properly Train Against Defendants County of San Diego, William Gore, and Kevin Kamoss.**

Plaintiffs' Fourth Claim for Relief for Failure to Properly Train alleges that Defendants County of San Diego, Sheriff Gore, and Lieutenant Kamoss' failed to "properly train their deputies and officers to properly monitor and/or inspect the well being of inmates," which caused Mr. Boulanger to suffer unconstitutional treatment and inhumane conditions during his detention.  SAC at 34:28-35:8.

Defendants argue that "because Reyes and Dixon did not violate the Constitution, the claims against their supervisors fail as well."  Mot. at 8:22-25.  Defendants also point out that Plaintiffs have sued "every individual defendant in both their individual and official capacity."  *Id.* at 19.  They argue that to the extent the defendants are sued under Section 1983 in their official capacity, such claims must be dismissed.  *Id.* at 19:1-11.  In response, Plaintiffs argue that their naming of Gore and Kamoss is not duplicative because "[i]t is well-established that supervisors, in their supervisory role, can be held personally liable under a § 1983 claim in their individual capacity for their participation in the deprivation of a constitutional right if there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  Oppo. at 26:13-20 (citing *Phillips v. City of Fairfield*, 406 F.Supp.2d 1101 (E.D. Cal. 2005); *Brown v. County of Kern*, 2008 U.S. Dist. LEXIS 14216 (E.D. Cal. 2008)).  This Court does not dispute this proposition.  However, the problem lies in that the SAC fails to allege sufficient facts to indicate any direct participation by Supervisory Defendants.  As an initial matter, however, the Court addresses the fact that, as Defendants have pointed out, Plaintiffs have named every defendant in both their individual and official capacity.

**1.**   ***Claims against Supervisory Defendants in their Official Capacity***

Section 1983 provides a means to sue individuals acting under color of state law in

-48-

their individual, but not official capacity.  *See, e.g., Vance v. County of Santa Clara*, 928 F. Supp. 993, 996 (N.D. Cal. 1996) (providing that "persons" under Section 1983 means only "state and local officials sued in their individual capacities, private individuals and entities which act under color of state law, and/or the local governmental entity itself"); *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) ("Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights."). "[S]tate officials acting in their official capacities are [not] 'persons' amenable to suit for damages under 42 U.S.C. § 1983." *Munoz*, 208 F. Supp. 2d at 1150-51.  "A suit against a governmental officer in his official capacity is equivalent to a suit against the governmental entity itself." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991).  "In an official-capacity suit, the government entity is the real party in interest and the plaintiff must show that the entity's policy or custom played a part in the federal law violation." *Vance*, 928 F. Supp. at 996 (holding that "[t]he Court follows other District Courts in holding that if individuals are being sued in their official capacity as municipal officials *and* the municipal entity itself is also being sued, then the claims against the individuals are duplicative and should be dismissed").  "In contrast, in a personal-capacity suit, the plaintiff is trying to place liability directly on the state officer for actions taken under the color of state law." *Vance*, 928 F. Supp. at 996.

Here, Plaintiffs have already pled a separate claim against the County of San Diego, making the official capacity allegations duplicative.  The Court acknowledges that not just Supervisory Defendants but also all individual defendants have been sued in their individual and official capacity, which is incorrect given Section 1983's purpose is to provide a mechanism to sue individuals acting under color of state law in their individual capacity.  Thus, the Court agrees with Defendants and dismisses all defendants to the extent they are sued in their official capacity, leaving only the allegations against them in their individual capacity.

The Court notes, *sua sponte*, that the SAC also includes allegations against Does 1

through 50.  This is improper.[20]  A Section 1983 action must allege how each individual defendant directly participated in the violation of the plaintiff's rights.  By virtue of including doe allegations, this feat is impossible.  Given two and a half years have passed and Plaintiffs have had three attempts to frame the complaint, it seems unlikely that Plaintiffs are still looking for unnamed defendants believed to have violated Mr. Boulanger's rights.  As such, Does 1 through 50 are dismissed.

### 2.   *Claims against Supervisory Defendants in their Individual Capacity*

Having dismissed all claims against all defendants to the extent those claims are brought against those defendants in their official capacity, the Court examines the claims against Supervisory Defendants in their individual capacity.

Defendants argue that the Fourth Claim for Relief fails for several reasons: First, "[t]o the extent Plaintiffs seek to proceed against Supervisory Defendants in their individual capacity, Plaintiffs have not alleged sufficient facts to state a claim" because Plaintiffs do not allege either Supervisory Defendant had any direct involvement with Mr.

---

[20]   The FRCP neither authorize nor prohibit the use of fictitious parties; however, FRCP 10 does require a plaintiff to include the names of all parties in his complaint. *See Keavney v. Cty. of San Diego*, No. 319CV01947AJBBGS, 2020 WL 4192286, at *4-5 (S.D. Cal. July 21, 2020) (Battaglia, J.) (citing FED. R. CIV. P. 10(a)).  Plaintiffs' SAC includes allegations against Does 1 through 50.  Naming doe defendants further implicates Rule 4 of the FRCP requiring service of the complaint. *Id.* (noting that "it is effectively impossible for the United States Marshal or deputy marshal to fulfill his or her duty to serve an unnamed defendant"); *Finefeuiaki v. Maui Cmty. Corr. Ctr. Staff & Affiliates*, 2018 WL 3580764, at *6 (D. Haw. July 25, 2018) (same).   "A plaintiff may refer to unknown defendants as Defendant John Doe 1, John Doe 2, John Doe 3, and so on, but he must allege specific facts showing how each particular doe defendant violated his rights." *Keavney*, 2020 WL 4192286 at *4-5.  Where a "[p]laintiff fails to link any particular constitutional violation to any specific, individual state actor," or seeks "to even minimally explain how any of the unidentified parties he seeks to sue personally caused a violation of his constitutional rights," the court must dismiss those individuals, especially when they have not been served. *See, e.g.*, FED. R. CIV. P. 4(m) (providing that "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time."); *see also* S.D. Cal. Civ. R. 41.1(a); *Keavney*, 2020 WL 4192286 at *4-5 (dismissing the plaintiff's first amended complaint).  Thus, all doe defendants are dismissed *without prejudice* for want of prosecution pursuant to Rule 4(m).

-50-

Boulanger, and supervisors cannot be held liable under Section 1983 for the actions of their subordinates. Mot. at 8:12-28. Defendants are correct that a supervisor may only be held liable in an action brought pursuant to Section 1983 for a subordinate's constitutional violations "if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Maxwell v. Cty. of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013). This is because "[t]here is no respondeat superior liability under 1983." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989). Second, Plaintiffs' Fourth Claim for Relief for failure to train against Supervisory Defendants contains no allegations that either Supervisory Defendant actually personally participated in the training of any of the Deputy Defendants. *Id.* at 19:24-20:2. Third, even if Supervisory Defendants had participated in the training of Deputy Defendants, Deputy Defendants' inmate checks "did not cause Mr. Boulanger's suicide." Mot. at 20:5-7. Fourth, to the extent that the Deputy Defendants have not violated Mr. Boulanger's constitutional rights, "there can be no supervisor liability when there has been no constitutional deprivation." *Id.* at 20:9-12.

"[A] federal official's liability 'will only result from his own neglect in not properly superintending the discharge' of his subordinates' duties." *Iqbal*, 556 U.S. at 676 (citing *Dunlop v. Munroe*, 11 U.S. 242, 269 (1812)). Thus, "[u]nder Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability." *Hansen v. Black*, 885 F.2d 642, 645–46 (9th Cir. 1989). To hold a supervisor liable under Section 1983, a plaintiff must show (1) "personal involvement in the constitutional deprivation" or (2) "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Henry A. v. Willden*, 678 F.3d 991, 1003–04 (9th Cir. 2012) (citing *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011)). Where the supervisors did not directly participate in the alleged wrongful conduct, as was the case here, a plaintiff must plead facts showing the supervisor defendants "implement[ed] a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Hansen*, 885 F.2d at 646 (internal quotations marks omitted). "The inquiry into causation must be individualized to focus on the duties

and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988); *see also Starr*, 652 F.3d at 1207. "[A] plaintiff must show the supervisor breached a duty to plaintiff which was the proximate cause of the injury." *Starr*, 652 F.3d at 1207. A plaintiff may establish the requisite causal connection by showing (1) "a series of acts by others" or (2) a knowing refusal "to terminate a series of acts by others, which [the supervisor] knew or reasonable should have known would cause others to inflict a constitutional injury." *Starr*, 652 F.3d at 1207-08 (citing *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001)). As the Supreme Court held in *Ashcroft v. Iqbal*, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. 662, 676 (2009) (holding that the plaintiff had failed to state a claim in his *Bivens* action against his jailers and various officials for unconstitutional discrimination; "[h]olding Attorney General Ashcroft and Director Mueller personally liable for unconstitutional discrimination if they did not themselves have a discriminatory purpose would be equivalent to finding them vicariously liable for their subordinates' violation, which *Bivens* and § 1983 do not allow.")

Thus, "[i]n § 1983 lawsuits, 'supervisors can be held liable for: (1) their own culpable action or inaction in the training, supervision, or control of subordinates; (2) their acquiescence in the complained-of constitutional deprivation; and (3) conduct that showed a reckless or callous indifference to the rights of others.'" *Shafer v. City of Boulder*, 896 F. Supp. 2d 915, 935 (D. Nev. 2012) (quoting *Cunningham v. Gates,* 229 F.3d 1271, 1292 (9th Cir. 2000)); *see also Starr*, 652 F.3d at 1205–09. Where a plaintiff seeks to hold a supervisor liable in a Section 1983 claim for lack of training, the requisite state of mind is "deliberate indifference" to the right of citizens whom the untrained officers are likely to encounter. *See, e.g.*, *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). Under this standard, a plaintiff must allege facts to show that the County and officers "disregarded the known or obvious consequence that a particular omission in their training program would

-52-

cause [municipal] employees to violate citizens' constitutional rights." *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014). "To meet this standard, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal quotation omitted). Liability for failure to train officers could conceivably arises from a single incident only where "in light of the duties assigned to specific officers . . . the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390; *see also Figueira by & through Castillo v. Cty. of Sutter*, No. 2:15-CV-00500-KJM-AC, 2015 WL 6449151, at *8 (E.D. Cal. Oct. 23, 2015) (dismissing claim for municipal liability with leave to amend and noting "[plaintiff's] suicide alone does not plausibly establish that Yuba and Sutter County provided employees with inadequate training by de facto policy" despite pleading two other deaths in the previous three years).

For instance, in *Vance*, the court dismissed the plaintiff's cause of action as to individual defendants with leave to amend (albeit cautioning that the plaintiffs were being given "one last attempt") so they could "identify how each of the individual defendants is alleged to have violated the Plaintiffs' civil rights." 928 F. Supp. at 997. The court noted that "Plaintiffs must allege with at least some degree of particularity overt acts in which these Defendants engaged." *Id.* (citing *Jones v. Community Redevelopment Agency*, 733 F.2d 646, 651 (9th Cir. 1984)). The court noted that it "does not require proof as to the events in question, but merely Plaintiffs' factual allegations." *Id.* "The Plaintiffs must frame their Complaint with "clear and concise averments stating which defendants are liable to plaintiffs for which wrongs." *Id.* (citing *McHenry v. Renne*, 84 F.3d 1172, 1175 (9th Cir. 1996)).

Returning to the *Neil* case, the court there noted that the SAC never (1) alleged whether either supervisor "had a suicide prevention training or policy in place"; (2) established a causal connection between any of the defendants and the events surrounding

the student's suspensions, expulsion, and suicide; (3) alleged the supervisory defendants "were aware of or participated in any of the circumstances as specifically related to the decisions concerning" the student's discipline at either school; or (4) alleged the defendants implemented any policies. 2017 WL 4652744 at *9. Instead, the only references to the supervisory defendants "are generalized allegations of knowledge as to unconstitutional suspension policies and conclusory statements as to failure to train . . . and suicide prevention as the cause of Neil's suicide." *Id.* However, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Iqbal*, 556 U.S. at 678 (internal citations omitted)). "General allegations that do not establish a link between the conduct alleged and specific defendants do not meet the minimal pleadings required to defend against a Rule 12(b)(6) motion and allegations of what Defendants in general knew or did lacks the requisite specificity." *Id.* (internal quotations omitted). Thus, the Court dismissed "the SAC's allegations with respect to the supervisory defendants." *Id.* at *10.

Similar to the SAC in *Neil*, the SAC here likewise fails to allege (1) that either supervisor had a suicide prevention training or policy in place; (2) any causal connection existed between the defendants named in the Third Claim for Relief and Mr. Boulanger's injuries; (3) Supervisory Defendants were aware of or participated in the events surrounding Mr. Boulanger's death—such as by approving of them or failing to terminate them; or (4) Supervisory Defendants implemented any policies that caused Mr. Boulanger's death. As pled, the general allegations in the SAC, like the general allegations in the *Neil* SAC, "do not establish a link between the conduct alleged and specific defendants" such as would "meet the minimal pleadings required to defend against a Rule 12(b)(6) motion." *Neil*, at *9.

In dismissing the allegations against the supervisory defendants, the *Neil* court analyzed the case of *Vivanco v. California Dep't of Corr. & Rehab.*, No. 117CV00434LJOBAM, 2017 WL 2547026, at *4 (E.D. Cal. June 13, 2017). In *Vivanco*, a plaintiff-mother brought suit after her son committed suicide while incarcerated. *Id.* at

*1. The plaintiff's son "suffered from mental health issues, including severe depression." *Id.* Staff where he was incarcerated called the son names; forced him to wear a straight jacket; and deprived him of hygiene products as well as reading, writing, and entertainment materials. *Id.* at *1. Like the SDCCJ in this case, "regulations mandated visual welfare checks of inmates every 30 minutes," but the plaintiff alleged that "prison staff regularly confirmed checks without observing the inmate." *Id.* at *2. On the day the inmate committed suicide, an officer saw the inmate braiding his sheets during a welfare check, and upon seeing this, said, "'we got a faker, and continued his rounds without removing the sheets or alerting any other staff member." *Id.* at *2. When another officer conducted the next welfare check, an inmate told the officer he heard a struggle in the inmate's cell. *Id.* at *2. Upon investigation, that officer discovered the inmate hanging from his sheet, and the cause of death was declared suicide by hanging. *Id.* The *Vivanco* complaint asserted that various defendants failed to adequately supervise employees, which constituted deliberate indifference. *Id.* at *2. It also included allegations that "customs, practices or policies" at the state prison led to the inmate's suicide including the "failures to establish a suicide prevention program, provide staff and training in order to offer adequate psychiatric care, to implement sufficient safety and suicide prevention guidelines, and to properly classify and house suicidal inmates." *Id.* at *4. However, the court held those allegations were not sufficient to establish individual liability under Section 1983 to survive a motion to dismiss. *Id.* The complaint did not "plead specific facts" demonstrating the supervisor defendant's role in any alleged deprivations. *Id.* at *4. There was no allegation that the supervisory defendant "personally participated in any alleged conduct" or was aware the staff was not adhering to policy regarding welfare checks. *Id.* at *4. Thus, because "any potential liability is based upon . . . [the supervisory defendant's] actions, Plaintiff must allege with specificity what he knew and did, not what Defendants in general knew and did." *Id.* at *4. Thus, the claim at issue was dismissed with leave to amend. *Id.* at *4.

Even in the face of the egregiously improper soft count in *Vivanco*, the supervisory

-55-

defendants were still not held liable because the plaintiff failed to plead the defendant's role in the alleged constitutional violations (beyond mere conclusory allegations). The Third Claim for Relief in Plaintiffs' SAC suffers from the same deficiencies.

Plaintiffs rely on *Larez v. City of Los Angeles,* 946 F.2d 630 (9th Cir. 1991) for the proposition that supervisory liability may be imposed in this case. However, in *Larez,* even though the court held that to be held liable, a supervisor need not be "directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury," it still required participation, which could include the supervisor's "own culpable action or inaction in the training, supervision, or control of his subordinates," "acquiescence in the constitutional deprivations of which the complaint is made," or "conduct that showed a reckless or callous indifference to the rights of others." 946 F.2d 630, 645-46 (internal citations omitted). Thus, *Larez* in no way means that supervisors may be held liable without any involvement at all.

Plaintiffs also cite to *Leon v. Cty. of San Diego*, 115 F. Supp. 2d 1197, 1203 (S.D. Cal. 2000), arguing that the case "rejected the argument that the Sheriff must have some personal involvement with the decedent's death." ECF No. 59 at 28:21-22. However, not only is this not the law, but *Leon* is also a pre-*Twombly/Iqbal* case. As a result, even though the Court found the allegations of failure to train and supervise were sufficient to survive a motion to dismiss, that court was applying an outdated legal standard that no longer applies and does not apply to Defendants' Motion to Dismiss Plaintiffs' SAC.

Plaintiffs also cite to *Shafer v. City of Boulder*, 896 F. Supp. 2d 915 (D. Nev. 2012) for the proposition that supervisory defendants need not be physically present in order to be held liable. Oppo. at 28:24-29:3. It may be that supervisors need not be physically present to be held liable; however, just because a supervisor does not need to be physically present does not mean he is alleviated from the requirement that he personally participate in the alleged constitutional violations in some fashion. For example, in *Shafer*, even though the supervisor was out of town, the court noted that if he approved of or condoned of the acts at issue, he could still be held liable. 896 F. Supp. 2d at 936. Nonetheless, the

Court denied the motion for summary judgment because it found that a reasonable juror could conclude that the police chief did not ratify the alleged unlawful actions, and as such, did not violate a constitutional right. 896 F. Supp. 2d at 936. Thus, *Shafer* comports with other case law by still requiring supervisor defendants to participate in the alleged unlawful conduct, regardless of the whether the supervisors are physically present or not.

Finally, Plaintiffs rely on the case of *Starr v. Baca* for the proposition that a "supervisor need not be directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury." Oppo. at 29:3-6 (citing *Starr*, 652 at 1205). Again, it may be that supervisor defendants need be "involved in the *same* way as are the individual officers on the scene." However, those officers must be involved in *some* capacity in order to be held liable. In *Starr*, a prisoner brought a Section 1983 suit for damages from an attack he allegedly suffered while he was an inmate in the county jail, and the district court dismissed the prisoner's supervisory liability claims for deliberate indifference against the sheriff in his individual capacity. 652 F.3d at 1204. On appeal, the Ninth Circuit held that the prisoner had sufficiently alleged a supervisory liability claim of deliberate indifference against the sheriff in violation of the Eighth and Fourteenth Amendments based on allegations that the sheriff failed to act to protect inmates despite knowledge of them being in danger. *Id.* at 1208. The court noted holding a supervisor liable on this basis still required "[a] showing that a supervisor acted, or failed to act, in a manner that was deliberately indifferent," and that "the supervisor is being held liable for his or her own culpable action or inaction, not vicariously liable for the culpable action or inaction of his or her subordinates." *Id.* at 1206-07. On that basis, the court concluded that under *Iqbal*, "a plaintiff may state a claim against a supervisor for deliberate indifference based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates." *Id.* at 1207. Thus, the plaintiff's "allegations that the actions or inactions of the person 'answerable for the prisoner's safe-keeping' [e.g., the sheriff] caused his injury" were "sufficient to state a claim of supervisory liability for deliberate indifference." *Id.* at 1208.

As to Sheriff Gore, Plaintiffs allege that he "oversees the San Diego Central Jail and ensuring [sic] compliance with all of its policies and procedures including those mentioned herein." SAC at 21:1-4. They further allege that he "was aware of a systemic problem within his jail of failing to [a] prevent suicides because of inadequate staffing, . . . [b] follow policy and procedure, . . . [c] identify at risk suicide candidates, . . . [d] provide medical aid to inmates detoxing from opiate addiction, . . . [and] [e] provide medical care and access to mental health drugs in inmates with known or obvious suicidal ideations." *Id.* at 21:4-11. Plaintiffs then conclusorily allege that "[t]he acts and/or omissions of SHERIFF were a proximate cause of Richard Boulanger's death" *without actually alleging what the acts of Sheriff Gore were.*[21] *Id.* at 21:13-14. While actions that shock the conscience show deliberate indifference, conclusory allegations such as the allegation that "SHERIFF's deliberate indifference towards jail inmates such as Boulanger shocks the conscious," SAC at 21:15-17, do not create a plausible claim for relief. *Iqbal*, 556 U.S. at 676.

As to Lieutenant Kamoss, Plaintiffs' allegations boil down to pleading that Deputy Dixon "worked under the direction and supervision of KAMOSS, who set the policies and procedures with respect to inmate safety and security." SAC at 11:4-7. Plaintiffs further allege that Lieutenant Kamoss "failed to properly supervise deputy DIXON," *id.* at 13:1,

---

[21] As previously discussed, first, Plaintiffs' allegations of a failure to prevent suicides because of inadequate staffing are implausible because nowhere in the SAC do Plaintiffs plausibly allege that Mr. Boulanger's death was caused, in part, due to inadequate staffing. Second, Plaintiff's allegations of a failure to follow policy and procedure fail because while Plaintiffs' conclusorily allege Sheriff Gore was aware deputies failed to follow policy and procedure, there are no allegations as to how he knew this, when he was informed of it, any basis for this knowledge, or which policies he knew were being violated. Thus, such generalized allegations of knowledge fail to meet the *Iqbal* standard. *Neil*, 2017 WL 4652744 at *9. Third, Plaintiffs' allegations of a failure to provide medical aid to inmates detoxing from opiate addiction fail in light of the fact that Mr. Boulanger was given medication to detox upon booking. SAC at 8:2-3. Fourth, Plaintiffs' allegations of a failure to provide medical care and access to mental health drugs in inmates with known or obvious suicidal ideations also fail because the Court has already concluded that Mr. Boulanger's suicidal intentions were neither known nor obvious.

and "[i]t is highly probable that had KAMOSS properly supervised DIXON, DIXON would not have turned off everything in the watchtower." *Id.* at 11:1-4. Plaintiffs also point out that "Lieutenant Defendant KAMOSS reviewed the video of REYES performing his alleged 'Soft Count' of Richard Boulanger . . . and said it was not a sufficient 'life check' because REYES did not have a count sheet with him and did not check wrist bangs." *Id.* at 18:9-15. In fact, he stated he "would initiate an investigation for a policy violation." *Id.* at 18:15-17. This Court finds that the fact that an investigation for a policy violation would be initiated shows that inadequate proof of life checks were not part of their official policy and were not approved of by Lieutenant Kamoss.

Defendants also argue that Plaintiffs' allegations against the County fail "because Plaintiffs specifically allege that Deputies Reyes and Dixon acted contrary to written policy and there are no allegations of facts establishing a pattern of similar constitutional violations." Mot. at 9:5-9. As they stated, "Simply referencing other jail suicides is not enough since each instance involves [a] unique set of circumstances and none involve a situation like this where there was no known information suggesting a heightened risk of suicide." *Id.* at 9:9-12. Plaintiffs respond that "it is very foreseeable that purposefully muting out and ignoring inmate distress calls for immediate medical treatment could result in a constitutional injury." Oppo. at 27:26-28. However, there is no allegation in the SAC that either of Supervisory Defendants and/or the County had any idea calls were being muted or ignored, much less if they did, that they failed to do anything about it. Plaintiffs allege that Lieutenant Kamoss "developed and oversaw policies and procedures which affect administrative activities as well as the care of patients in the County's detention facilities." SAC at 33:8-16. They also argue "[a]ll Deputy Defendants worked under the direction of KAMOSS and GORE." *Id.* at 33:15. Plaintiffs also allege that "[t]here has been an official policy of acquiescence in the wrongful conduct," and "Defendants failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations." *Id.* at 34:7-10. Despite these allegations, Plaintiffs never allege any specific previous incidences were Supervisory Defendants were made aware of either (1) muting

the intercom and/or (2) inadequate soft counts, and nonetheless, failed to do anything about it.

In *King v. United States*, 756 F. Supp. 1357, 1358-1359 (E.D. Cal. 1990), a plaintiff wife brought a wrongful death suit after her husband, a Staff Sergeant in the Army and Air Force, committed suicide after having a meeting with his Colonel, who told him about his wife's arrest for suspected shoplifting. Ultimately, the court concluded that the wife "failed to and is unable to show proximate cause [because] she is unable to establish the existence of this element so completely essential to her case." *Id.* at 1360. As a result, the court granted the government's partial summary judgment motion and dismissed the wrongful death count of her complaint. *Id.* at 1361. In arriving at this decision, the court reiterated how a "condition necessary for a finding of negligent liability requires a determination that the . . . supervisor's conduct 'proximately caused' [the inmate] . . . to commit suicide." *Id.* "Courts have long held that when, after a defendant's conduct occurs, an independent intervening act operates to produce injury, the chain of causation may be broken." *Id.* at 1361. "The test is whether 'a reasonable [person] knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted.'" *Id.* (citing Rest. 2d, Torts, § 447(b)). The court determined that when it looked back at the death, "it would have appeared highly extraordinary that the isolated event of his wife's arrest for suspected shoplifting would have brought about his suicide." *Id.* Thus, the Sergeant's "tragic death had to have involved an intervening, independent force—his own intention to kill himself." *Id.* at 1361. Further, his "meeting with his superiors would also have been an independent intervening event, breaking the chain of causation." *Id.* As a result, "the most that can be said concerning negligence is that it provided a greater opportunity than already existed for [the decedent to] act." *Id.* at 1361. However, his death "required the intervention of an additional independent force, to wit, [his own] intentional act." *Id.*

Similar to the *King* plaintiff, Plaintiffs fail to and are unable to show Supervisory Defendants' conduct proximately caused Mr. Boulanger's suicide. Plaintiffs never allege

that Deputy Defendants were (1) in any way trained to mute the intercom or (2) perform cursory checks of inmates. *See generally* SAC. Their allegations that "[t]he failure of KAMOSS and GORE to properly train deputy Defendants was a proximate cause of his death," *id.* at 19:33-5, are nothing more than conclusory allegations that fail to state a plausible claim for relief, especially considering that there *are no facts pled to show that either Sheriff Gore or Lieutenant Kamoss trained Deputy Reyes or Dixon to violate policy*—only that Deputy Defendants' conduct did, in fact, violate policy. In fact, Plaintiffs plead no facts showing what kind of training the deputies did receive. There are also no facts pled indicating whether the training was inadequate and/or whether there was never any training in the first place. Certainly, if there was training, it would negate a general failure to train claim in favor of an inadequate training claim.

**E.    Qualified Immunity.**

Defendants argue that even if Plaintiffs had alleged a constitutional violation, all of the individuals would still be entitled to qualified immunity because there was no clearly established law holding that "a defendant is found to violate the Constitution in a jail suicide case where there is no information to even suspect the inmate has a heightened risk of suicide." Mot. at 8:25-9:4, 15:13-18. Plaintiffs respond that "[t]his court has held Qualified Immunity does not apply in situations such as those that gave rise to this lawsuit." Oppo. at 30:20-21. However, Plaintiffs never allege the special issues in this particular lawsuit are clearly established. *See generally* SAC.

In the wake of George Floyd, "[t]he doctrine of qualified immunity has become the subject of intense debate, as American policing has gone under the microscope." Mitch Zamoff, *Determining the Perspective of a Reasonable Police Officer: An Evidence-Based Proposal*, 65 Vill. L. Rev. 585, 596 (2020); *see also Baxter v. Bracey*, 140 S. Ct. 1862, 1865 (2020) (Thomas, J., dissenting) ("I continue to have strong doubts about our § 1983 qualified immunity doctrine."). This Court lacks the power to overturn Supreme

Court precedent and makes no comment about the propriety of doing so.[22]   However, like many legal doctrines, quality immunity began with laudable purposes.  *See, e.g., Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982) (recognizing "the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service").  While police misconduct is unquestionably intolerable, courts must also acknowledge that for every instance of such behavior, thousands of police officers put their lives on the line on a daily basis in order to protect and serve the citizens of this country.  Zamoff, 65 Vill. L. Rev. 606-07 (noting that (1) "police officers operate in a work environment that is fraught with risk," (2) "each year a large number of U.S. law enforcement officers are the victims of assault," and (3) "many officers will have exposure (often repeated exposure) to dangerous situations involving a risk of death or serious bodily harm").  If each officer could be personally and individually sued in the line of duty, hardly anyone would want to assume the risk of personal liability by serving as a police officer.  While training of officers could always be improved—just as, this Court suspects, training could be improved in any profession, abrogating qualified immunity would not only open every police officer up to personal liability, but would also open the floodgates to lawsuits for any pre, during, or post-arrest condition not to a defendant's liking when our courts are already overburdened.

---

[22]   "The U.S. House of Representatives recently adopted the 'George Floyd Justice in Policing Act of 2020' that would, among other things, eliminate qualified immunity as a defense in cases alleging excessive force by the police."  Zamoff, 65 Vill. L. Rev. at 596.  However, "Senate Republicans have characterized the eradication of qualified immunity as a 'non-starter' or 'poison pill' that will not be a feature of any police reform legislation endorsed by the Republican-controlled Senate."  *Id.*  Further, "although Supreme Court Justices from both ends of the ideological spectrum have expressed skepticism about the judicially manufactured doctrine of qualified immunity, the Court recently declined to hear a case that would have provided it with an opportunity to revisit the validity of the doctrine."  *Id.* at 597-98.  As a result, "absent additional developments in the political or judicial arenas, the qualified immunity defense will remain available to police defendants."  *Id.* at 598.

For now, absent congressional action or a Supreme Court decision abandoning the doctrine, qualified or absolute immunity remains an affirmative defense for government officials sued in their individual capacities in a Section 1983 action.   *Spoklie v. Montana*, 411 F.3d 1051, 1060 (9th Cir. 2005).  "Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Estate of Lopez ex rel. Lopez v. Torres*, 105 F. Supp. 3d 1148, 1164 (S.D. Cal. 2015) (citing *Anderson v. Creighton,* 483 U.S. 635, 638-40 (1987)); *accord Horton*, 915 F.3d at 599.  "This privilege is 'an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Torres*, 105 F. Supp. at 1164 (citing *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001)).  "Thus, the Supreme Court 'repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Torres*, 105 F. Supp. at 1164 (declining to decide the issue of qualified immunity where the court had already decided the complaint must be dismissed for other reasons) (citing *Saucier*, 533 U.S. at 201); *Kwai Fun Wong v. United States,* 373 F.3d 952, 957 (9th Cir. 2004) (recognizing that a motion to dismiss on qualified immunity grounds puts the court in the difficult position of deciding "far-reaching constitutional questions on a non-existent factual record" and that while "government officials have the right . . . to raise . . . the qualified immunity defense on a motion to dismiss, the exercise of that authority is not a wise choice in every case").  However, "[w]hen qualified immunity is asserted at the pleading stage, the precise factual basis for the plaintiff's claim or claims may be hard to identify." *Pearson v. Callahan*, 555 U.S. 223, 238-39 (2009) (noting that "several courts have recognized that the two-step inquiry 'is an uncomfortable exercise where . . . the answer [to] whether there was a violation may depend on a kaleidoscope of facts not yet fully developed' and have suggested that '[i]t may be that *Saucier* was not strictly intended to cover' this situation.").

The doctrine of qualified immunity attempts to balance two important and

sometimes competing interests: (1) "the need to hold public officials accountable when they exercise power irresponsibly" as well as (2) "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.  It must take into account the real-world demands on officials in order to allow them to act "swiftly and firmly" in situations where the rules governing their actions are often "voluminous, ambiguous, and contradictory." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citation omitted).  "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.*  Thus, plaintiffs bringing a Section 1983 claim against individual officers and seeking to avoid the defense of qualified immunity must "demonstrate that (1) a federal right has been violated and (2) the right was clearly established at the time of the violation." *Horton*, 915 F.3d at 599 (citing *Pearson*, 555 U.S. at 232).  A district court may address these questions in the order most appropriate to "the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236, 242.

### 1. *Violation of Constitutional Right*

First, a court must determine whether, when construing all facts in the most favorable light to the non-moving party, as required under the standard mandated by Rule 12(b)(6), the plaintiff has made "out a violation of a constitutional right." *Pearson*, 555 U.S. at 232.  As stated, this Court finds that in the absence of allegations that the individual defendants knew Mr. Boulanger was a suicide risk, neither an inadvertent muting of an intercom nor improper soft counts—even where they may have unintentionally caused a delay in rendering care—constitutes a constitutional violation.  Although not required to continue to the next step if a violation of a constitutional right has not been established, *see, e.g.*, *Saucier*, 533 U.S. at 201 (providing that if a court determines that Plaintiff's allegations do not support a statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified immunity"), because the Court is dismissing the entire SAC, the Court, nonetheless, continues onto the second step.

### 2.   *Clearly Established Law*

If a court decides that the facts a plaintiff has alleged show "a violation of a constitutional right," *Pearson*, 555 U.S. at 232, "[t]he plaintiff bears the burden of showing that the right he alleges to have been violated was clearly established," *Collins v. Jordan*, 110 F.3d 1363, 1369 (9th Cir. 1996).  A right is clearly established "[i]f the only reasonable conclusion from binding authority [was] that the disputed right existed," *Blueford v. Prunty*, 108 F.3d 251, 255 (9th Cir. 1997), and "every reasonable official would have understood that what he is doing violates that right."  *Horton*, 915 F.3d at 599 (citing *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946 (9th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015))).   Generally, "[i]f the controlling law is not clearly established, a reasonable person would not be expected to know how to structure his conduct in order to avoid liability." *Romero v. Kitsap County*, 931 F.2d 624, 628 (9th Cir. 1991).  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful[.]" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (denying qualified immunity to prison guards who handcuffed an inmate to a hitching post as punishment, even though no earlier cases had materially similar facts). Only "when the defendants' conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994).  This is an "exacting standard" which "gives government officials breathing room to make reasonable but mistaken judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law."  *City and County of San Francisco, Cal v. Sheehan*, 575 U.S. 600, 135 S. Ct. 1765, 1774 (2015) (alteration in original; internal quotation marks omitted).  If the officer makes a reasonable mistake as to what the law requires, then, the right is not clearly established, and the officer is entitled to immunity. *Torres*, 105 F. Supp. 3d at 1164.

Thus, Plaintiffs must show that, given the available case law at the time of Mr.

Boulanger's attempted suicide, a reasonable officer, knowing what Deputies Reyes and Dixon knew, would have understood that they created a substantial risk of harm to Mr. Boulanger such that their the failure to act was unconstitutional by (1) muting the intercom and (2) failing to check on Mr. Boulanger more than visual glances every half hour or more. The Court now turns to the directly applicable case law on point, which is sparse.

At the time of Mr. Boulanger's incident, the Ninth Circuit had held that officers who failed to provide medical assistance to a detainee should have known that their conduct was unconstitutional in two instances, neither of which resemble the facts in this case. *See Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1244-45 (9th Cir. 2010), *overruled by Castro*, 833 F.3d at 1244-45; *Conn*, 591 F.3d 1081.

In *Clouthier*, the plaintiffs and parents of a detainee brought a lawsuit pursuant to Section 1983, alleging a mental health specialist, two sheriff's deputies, and the County of Contra Costa violated the Fourteenth Amendment due process right of their son by failing to prevent his suicide while he was in pretrial detention. 591 F.3d at 1236. After filling out a mental health questionnaire, the detainee was evaluated by a mental health specialist and told her several times he was suicidal and "wanted to be 'unconscious for the rest of his life.'" *Id.* at 1237. The specialist's notes indicated the detainee had made numerous past suicide attempts. *Id.* Later that day, the detainee informed the specialist that he was not feeling suicidal anymore. *Id.* Nonetheless, the specialist persuaded him to consider medications, and a psychiatrist prescribed anti-depressants and Trazodone to help the detainee sleep. *Id.* at 1237-38. The psychiatrist also recommended that the detainee be placed in a housing section for unstable inmates, which was done. *Id.* at 1238. Around 7:00 p.m. that evening, a different mental health worker went to speak with the detainee for less than five minutes, and on the basis of that brief conversation, informed a deputy that the detainee could be given regular prison clothes and a blanket but not any utensils or personal hygiene items and removed from the observation room. *Id.* Before he was moved, he had been documented as skipping meals and free time. *Id.* at 1238-39. After dinner on the day he was moved, a deputy came to let the detainee's roommate out for recreational

-66-

time and told the detainee he would return to take him out for recreational time later. *Id.* at 1240. The detainee's roommate testified that although the deputy claimed he did not see the knotted sheet, when the roommate left the room, "he saw the sheet, still knotted, sitting on the edge of the bed, hanging over slightly," and although the deputy did not say anything about the sheet, "he sure should have been able to see it." *Id.* at 1240. Roughly thirty minutes later, the deputy and a nurse went into the detainee's cell and discovered him hanging by the neck from the knotted sheet. *Id.* Like Deputy Defendants here, the deputy administered CPR, and the detainee was taken to the hospital, where he died after being removed from life support ten dates later. *Id.* The detainee's parents sued alleging that the deputies and county had violated his constitutional rights under the Fourteenth Amendment due to the officials' deliberate indifference to the detainee's serious medical needs. *Id.* "They also alleged that Clouthier's death was caused by the County's established policies, its failure to train employees, and its ratification of the officials' illegal actions." *Id.* "After discovery, the defendants moved for summary judgment, which the district court granted on the merits as to each defendant." *Id.*

Although *Clouthier* applied a no longer applicable subjective standard, the analysis is still insightful. The *Clouthier* court concluded that as to the mental health specialist, she was not entitled to qualified immunity where she instructed officials to remove the detainee from suicide monitoring and return his clothes and bedding despite (1) knowing that the detainee was suicidal and had attempted suicide multiple times and (2) another staff member placing the detainee in a suicide smock and warning he needed constant monitoring to ensure his safety. *Id.* at 1238-43.

As to the deputy, however, the *Clouthier* court concluded that "the evidence adduced by the Clouthiers is insufficient to allow a jury to conclude that Foley knew Clouthier was suicidal and deliberately ignored that risk." *Id.* at 1247. It noted that there were no allegations that the deputy "had in fact seen the knotted sheet," and the parents "adduced no evidence to that effect." *Id.* at 1248-49. Thus, the deputy's testimony that "he did not see the knotted sheet is therefore undisputed." *Id.* at 1249. Further, even though the deputy

-67-

1   had been told the inmate "was suicidal, had 'numerous prior attempts' at suicide, and

2   needed to be on 15–minute checks," he "had no other information regarding Clouthier's

3   mental state" as he "did not have access to . . . notes or [the inmate's] . . . medical chart,

4   and he had not seen Clouthier's health questionnaire detailing his mental health history."

5   *Id.* at 1247. Further, to the deputy, the inmate's "removal from the Observation Log meant

6   he could be moved out of an Observation Room and into M–Module's general population,

7   and in his "experience, inmates having extremely serious mental health issues would be

8   transferred to the County's Psychiatric Emergency Services." *Id.* at 1247. As a result, the

9   district court did not err by granting summary judgment because the record included

10  insufficient evidence to create a genuine issue of material fact as to whether the deputy was

11  deliberately indifferent to a substantial risk of serious harm to the detainee, and thus, was

12  entitled to qualified immunity. *Id.* at 1247. In the absence of deliberate indifference, the

13  plaintiffs could not establish a constitutional violation to show liability under Section 1983

14  or why the deputy should not receive the benefit of qualified immunity.

15      Returning to *Conn*, however, the Ninth Circuit denied qualified immunity at the

16  summary judgment stage to officers who did not render help to the pre-trial detainee who,

17  while being transported, wrapped a seatbelt around her neck in an apparent attempt to

18  choke herself and threatened to commit suicide. 591 F.3d at 1090, 1102. After being

19  released and re-arrested the following day, she committed suicide in her cell. *Id.* at 1091.

20  The court reasoned that "[w]hen a detainee attempts or threatens suicide en route to jail, it

21  is obvious that the transporting officers must report the incident to those who will next be

22  responsible for her custody and safety." *Id.* at 1102.

23      Finally, in *Horton*, the Ninth Circuit found an officer entitled to qualified immunity.

24  915 F.3d at 599-602. Although the Ninth Circuit decided *Horton* in 2019, after Mr.

25  Boulanger's suicide attempt, and as such, it could not have served as "clearly established

26  law" at the time of the incident, the analysis is, nonetheless, inciteful as its facts more

27  closely resemble this case. In *Horton*, an eighteen-year-old boy was arrested, taken to the

28  local police department, and detained in a temporary holding cell. *Id.* at 596. The officer

-68-

explicitly asked the detainee whether he was having any medical issues, and the detainee responded in the negative. *Id.* at 601. However, from speaking with the detainee's mother, the officer was aware that the detainee had been suicidal two weeks before his arrest, and she thought he remained a suicide risk. *Id.* The officer also spoke with the detainee's girlfriend who informed the officer of the detainee's previous violent episodes but did not indicate any present suicidal intentions. *Id.* at 601. The officer left the detainee unattended for approximately a half hour while he spoke with the detainee's mother and completed paperwork. *Id.* at 596. During that time, the detainee "removed his belt, fed it through the cell door bars, and hanged himself, causing permanent and severe damage." *Id.* The defendant's mother, acting as guardian ad litem, filed suit alleging (1) negligence, (2) § 1983 liability on the part of the officers, (3) liability on the part of the municipal defendants under *Monell*, and (4) liability under California Government Code, § 845.6 on the part of all defendants. *Id.* at 598.

On appeal, the Ninth Circuit determined that based on the facts as well as the law at the time of the incident, including *Conn*, "a reasonable officer would not have known that failing to attend to Horton immediately would be unlawful." *Horton*, 915 F.3d at 601. The court noted that the detainee had neither attempted suicide in the presence of the officer, like the detainee in *Conn*, 501 F.3d at 1102, nor had he attempted suicide multiple times, been placed with significant suicide prevention measures, and had those measures removed like the detainee in *Clouthier*, 591 F.3d at 1245. "In short, whether or not Officer Brice was in fact deliberately indifferent to a substantial risk that Horton would attempt suicide in the time before he was checked, there was no case law at the time of the incident clearly establishing that a reasonable officer should have perceived the substantial risk." *Horton*, 915 F.3d at 601. Thus, the case law at the time of the suicide attempt "was simply too sparse and involved circumstances too distinct from those in this case, to establish that a reasonable officer would perceive a substantial risk that Horton would imminently attempt suicide." *Id.* at 601-02.

Here, the deputies named in this lawsuit did not witness Mr. Boulanger attempt

suicide in their presence prior to the alleged wrongful acts in this case, like the *Conn* detainee. 501 F.3d at 1102. The deputies also did not have knowledge of significant suicide prevention measures previously having been in place, like the detainee in *Clouthier*, as none had been in place here. 591 F.3d at 1245. Further, in *Horton*, even where the officers were explicitly told the detainee was a suicide risk by the detainee's mother, the Ninth Circuit still held that the officer was entitled to qualified immunity. 915 F.3d at 601. If the officers in *Horton* received the benefit of qualified immunity despite being explicitly told the detainee was a suicide risk, then, even if Plaintiffs had alleged Deputies Dixon and Reyes were told Mr. Boulanger was a suicide risk, this Court would agree with the *Horton* court by likewise finding that the officers should still receive the benefit of qualified immunity.

Defendants assert that the objective standard under *Gordon* does not apply because that standard was established in 2018, and the Court must determine qualified immunity based on the clearly established law at the time of the incident, in 2016. Mot. at 22:5-12 (citing *Horton*, 915 F.3d at 601 (providing that the new objective standard "has no bearing on the question of whether [the individual defendants] would have known that [their conduct] violated a clearly established right at the time of the incident")). Defendants argue that "[i]f Plaintiffs cannot identify any such case [in which a defendant is found to violate the Constitution in a jail suicide case where there is no information to even suspect the inmate has a heightened risk of suicide], then the individual defendants are entitled to qualified immunity." Mot. at 22:17-18. This Court concludes that Plaintiffs have not identified any clearly established Supreme Court or Ninth Circuit case law prior to the February 12, 2016 incident that would warrant overcoming qualified immunity. No cases have held or suggested that deputies in a correctional setting should be liable for the suicide attempt of an inmate where according to the SAC, someone—although not necessarily the deputies accused of wrongful conduct—knew a detainee had a history of mental illness and was going through withdrawal but had, nonetheless, been given medical care (e.g., medication) for that withdrawal. There are also no cases that have held or suggested that

deputies should be held liable for muting an intercom—whether intentionally or unintentionally—where it has not been shown that the muting of the intercom was done to intentionally ignore pleas by others for medical care to an inmate attempting suicide. As such, this Court concludes that Deputies Reyes and Dixon along with Supervisory Defendants are entitled to qualified immunity, particularly, in the absence of Plaintiffs' ability to plead a constitutional violation. *See, e.g., J.K.J.*, 2020 WL 738178 at *8 (holding that supervisors may not be held liable under Section 1983 "where no injury or constitutional violation has occurred"). Therefore, the claims against Deputy Defendants and Supervisory Defendants are dismissed *with prejudice*.

      **F.**    **Plaintiffs' Fourth and Fifth Claims for Relief Under *Monell* Against the County of San Diego.**

      As stated, Plaintiffs' Fourth Claim Relief included the County of San Diego in its allegations of failure to train. Plaintiffs' Fifth Claim for Relief for *Monell* Municipal Liability alleges "Defendant County of San Diego maintained an unconstitutional policy, ordinance or regulation which allowed their deputies and medical staff to deny medical care to inmates," which violated "substantive guaranties of the Fourth, Eighth[,] and Fourteenth Amendments to the U.S. Constitution." SAC at 35:16-19, 40:1-17. Plaintiffs allege "the permanent, widespread, well-settled practice or custom of Defendant was to deny treatment to inmates in serious medical distress and to place inmates in administrative segregation instead of the medical ward when inmates are in need of medical care when they request medical attention and denying them access to medical care." SAC at 36:4-10. Here, the SAC contains no allegations that Mr. Boulanger was denied medical care; rather the allegations seem to be that his access to medical care was delayed. In fact, the SAC alleges he was given medical care. SAC at 8:1-3, 9:1-6. The SAC also has no allegations pertaining to whether Mr. Boulanger was placed in administrative segregation, had requested medical care, and/or had asked to be placed in the medical ward. Thus, the other allegations appear to lack relevance to the facts pertaining to Mr. Boulanger.

      Defendants argue that Plaintiffs' claims against the County fail for three reasons:

First, because the individual defendants did not violate Plaintiffs' constitutional rights, the municipal claim is moot because "[a] prerequisite to any municipal civil rights claim is proof that a municipal employee violated at least one of the plaintiff's constitutional rights." Mot. at 23:2-9 (citing *Forrester v. City of San Diego*, 25 F.3d 804, 808 (9th Cir. 1994); *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Second, Defendants argue that "Plaintiffs do not seem to be suggesting that a County policy directed the allegedly offending conduct[; i]nstead, Plaintiffs affirmatively allege that Deputy Reyes and Dixon [were] acting contrary to or inconsistent with existing County Policy." Mot. at 16:26-17:2. As such, the policy itself could not be unconstitutional if the alleged wrongful conduct involved violating the policy. Third, Defendants argue that even though the SAC references other jail deaths in an attempt "to suggest a widespread pattern of deficient training . . . Plaintiffs cannot meet their burden . . . because they cannot establish there was a pattern of prior *constitutional violations*, i.e. where a County employee was found liable for violating the inmate's constitutional rights." *Id.* at 25:10-18 (citing *Fernandez v. District of Columbia*, 382 F. Supp.2d 63, 77-78 (D.D.C. 2005)). Plaintiffs respond that "[t]he SAC scrupulously alleges a widespread unconstitutional pattern in San Diego Jails." Oppo. at 34:4-5. Thus, "it is plausible to conclude that the facts in the SAC, paired with CLERB's findings, are more than sufficient for a valid *Monell* claim." *Id.* at 34:5-8.

In *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court held a municipality or local government may be held liable for constitutional violations under § 1983. *Id.* "*Monell* is clear, however, that 'a municipality cannot be held liable under § 1983 *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.'" *Scalia*, 308 F. Supp. 3d at 1077–79 (citing *Monell*, 436 U.S. at 691); *see also Horton*, 915 F.3d at 603 ("A municipality may not, however, be sued under a *respondeat superior* theory"). "Instead, a municipality can only be held liable for injuries caused by the execution of its policy or custom or by those whose edicts or acts may fairly be said to represent official policy." *Scalia*, 308 F. Supp. 3d at 1078 (citing *Monell*, 436 U.S. at 694). A "policy" is a "deliberate

choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008). "[A] local governmental entity may be liable if it has a 'policy of inaction and such inaction amounts to a failure to protect constitutional rights.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001) (quoting *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)). Accordingly, a plaintiff seeking to hold a municipality liable must show: (1) the plaintiff was deprived of a constitutional right; (2) the defendant-municipality had a policy or custom; (3) the defendant's policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cty.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001); *see also Estate of Wilson by & through Jackson v. Cty. of San Diego*, No. 20-CV-457-BAS-DEB, 2020 WL 3893046, at *5 (S.D. Cal. July 10, 2020) (quoting *Anderson v. Warner*, 451 F.3d 1063, 1070 (9th Cir. 2006)). "Although the requisites for municipal liability under § 1983 can be stringent, municipalities sued under § 1983, unlike individuals, are not entitled to immunity, qualified or otherwise, and so, unlike individuals, can never be immune from trial." *Horton*, 915 F.3d at 603.

### 1. *Plaintiffs Failed to Sufficiently Allege a Constitutional Violation by the Individuals*

With respect to the first requirement for municipal liability, "[n]either a municipality nor a supervisor, however, can be held liable under § 1983 where no injury or constitutional violation has occurred." *J.K.J.*, 2020 WL 738178 at *8 (dismissing the claim for municipal liability because the plaintiff had failed to state a claim for relief for violation of the plaintiff's constitutional rights, and as such, the claim for municipal liability must fail) (quoting *Jackson v. City of Bremerton*, 268 F.3d 646, 653–54 (9th Cir. 2001); *see also Forrester*, 25 F.3d at 808 ("[None] of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers if in fact the jury has concluded that the officer inflicted no constitutional harm"). In this case, because Plaintiffs

have failed to plead a deprivation of a constitutional right, the *Monell* claim fails as a matter of law due to their failure to describe deliberate indifference. However, because the Court is dismissing the entire complaint, the Court continues its analysis to show why even if Plaintiffs described a deliberate violation of a constitutional right, the Court would still dismiss the claims against the County.

### 2. *Plaintiffs Pled the County Had a Custom or Practice*

With regard to the second factor, "municipalities may be liable under § 1983 for constitutional injuries pursuant to: (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Horton*, 915 F.3d at 602–03.

Here, Plaintiffs' allegations focus on a "pervasive practice of custom." While Plaintiffs alleged the County had a custom or policy, SAC at 11, 17, in satisfaction of the second factor, they fail to plausibly plead that that custom or practice proximately caused a violation of Plaintiffs' constitutional rights, as analyzed below.

### 3. *The SAC Fails to Plausible Plead the County's Custom or Practice Amounted to Deliberate Indifference to Constitutional Rights*

With regard to the third element (e.g., the policy was the moving force behind the constitutional violation), "[a] plaintiff must . . . show "*deliberate* action attributable to the municipality [that] directly caused a deprivation of federal rights." *Horton*, 915 F.3d at 603 (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 415 (1997)). "Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." *Brown*, 520 U.S. at 415.

As stated, "[a] policy can be one of action or inaction," *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006), which "can be formal or informal." *Scalia*, 308 F. Supp. 3d at 1078 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 131 (1988)). "A county's failure adequately to train its employees to implement a facially valid policy can amount to deliberate indifference." *Long*, 442 F.3d at 1188. "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid

-74-

violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61; *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823 (1985) (plurality opinion) ("[A] policy of inadequate training is far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*") (internal quotations omitted). However, "[w]hile inadequacy of training may constitute a 'policy' giving rise to *Monell* liability, 'adequately trained [employees] occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable.'" *Scalia*, 308 F. Supp. 3d at 1078 (quoting *City of Canton v. Harris*, 489 U.S. 378, 379 (1989)). "Therefore, a claim of inadequate training is only cognizable under § 1983 'where [the County]'s failure to train reflects deliberate indifference to the constitutional rights of its inhabitants.'" *Scalia*, 308 F. Supp. at 1078 (citing *Harris*, 4889 U.S. at 392). "Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983." *Connick*, 563 U.S. at 61 (internal quotations omitted). "In order to show that a failure to train amounts to deliberate indifference, it is 'ordinarily necessary' to demonstrate 'a pattern of similar constitutional violations by untrained employees.'" *Scalia*, 308 F. Supp. at 1078 (quoting *Connick*, 563 U.S. at 62. "In certain cases, however, a showing of 'obviousness . . . can substitute for the pattern of violations ordinarily necessary to establish municipal liability.'" *Id.* (quoting *Connick*, 563 U.S. at 63).

"In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Canton*, 489 U.S. at 390). "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390–91 (1989) (citing *Springfield v. Kibbe*, 480 U.S., at 268 (O'CONNOR, J., dissenting); *Oklahoma City v. Tuttle, supra*, 471 U.S., at 821 (opinion of REHNQUIST, J.)). "It may be, for example, that an otherwise

-75-

sound program has occasionally been negligently administered." *Canton*, 489 U.S. at 391. "Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *Id.* "Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal." *Id.*

Here, as evidence of the County's failure to train and *Monell* liability, Plaintiffs rely only on evidence concerning two employees, Deputies Dixon and Reyes, which is not enough to constitute a program-wide policy of deliberate indifference. *See, e.g.*, *Blankenhorn v. City or Orange*, 485 F.3d 463, 484 (9th Cir. 2007) ("[E]vidence of the failure to train a single officer is insufficient to establish a municipality's deliberate policy."). "[A]bsent evidence of a program-wide inadequacy in training, any shortfall in a single [employee's] training can only be classified as negligence on the part of the municipal defendant—a much lower standard of fault than deliberate indifference." *Id.* Here, the Court finds the alleged shortfalls in only one employee's training regarding soft counts and another employee's training regarding watchtower duty similarly falls under the concept of simple negligence, not deliberate indifference. Because the connection between the County's alleged failure to train and the alleged constitutional violations are both unidentified and are far too tenuous to satisfy the high *Monell* standard, as pled, the Court must grant Defendants' motion to dismiss such claims.

For example, in *Villarreal*, the court considered the defendants' motion to dismiss the plaintiffs' claims for deliberate indifference of the prison officials to the medical needs of prisoners alleged against the County. 254 F. Supp. 3d at 1185. The court noted that "the deliberate indifference of prison officials to the medical needs of prisoners may . . . . 'rise to the conscience-shocking level' required for a substantive due process violation.'" *Id.* (citing *Lemire*, 726 F.3d at 1075). "A prison official's deliberately indifferent conduct will generally 'shock the conscience" so as long as the prison official had time to deliberate before acting or failing to act in a deliberately indifferent

manner." *Id.* The County, however, did not argue that it "lacked the time to deliberate before acting or failing to act." *Id.* Instead, the complaint alleged "that the County was on notice of its deficient policies as early as 2007, which is 8 years before Gillis's death." *Id.* at 1185. As a result, the court determined the plaintiffs had "sufficiently alleged that the County was deliberately indifferent to Gillis's serious medical needs" as well as "'conscience-shocking' conduct as required for Plaintiffs' claim for substantive due process violations." *Id.* (citing *See Lemire*, 726 F.3d at 1085). Accordingly, the court denied the County's motion to dismiss the claims against it. *Id.* at 1186. Here, similar to the *Villarreal* plaintiffs, Plaintiffs allege "[d]eaths of 60 inmates in the San Diego County jails in a span of five years," SAC at 37:9-10, "supports an inference that Defendants are promoting and maintaining a culture of deliberate indifference to human life at the Jail," *id.* at 37:16-20. However, unlike the *Villarreal* plaintiffs, Plaintiffs' claims here are not plausible because they (1) fail to cite that any of the other deaths at the SDCJ resulted from the same causes as Mr. Boulanger's death and (2) lack plausibility in light of allegations that Mr. Boulanger did, in fact, receive medical care. SAC at 8:3, 9:1-4.

In *Clouthier*, the court granted summary judgment with respect to the claims against the County because the plaintiffs "failed to adduce sufficient evidence to create a genuine issue of material fact as to whether Clouthier's death was due to a long-standing custom or practice, an act of omission that amounted to deliberate indifference, or actions the County adopted as policy when it failed to discipline its employees." 591 F.3d at 1254. Here, Plaintiffs have alleged Mr. Boulanger's death was "the proximate result of a custom, policy, pattern or practice of deliberate indifference by COUNTY to the repeated violations of the constitutional rights of citizens by Sheriff deputies working at the San Diego County Jail." SAC at 38:14-39:3. However, similar to the *Clouthier* plaintiffs, Plaintiffs fail to plead sufficient facts to create a plausible claim for relief under any of these legal theories.[23]

---

[23] First, Plaintiffs allege that "[t]here was a custom and practice of not properly counting, checking on, and/or monitoring the wellbeing of inmates, including those incarcerated going through heroin withdrawal." SAC at 36:11-14. However, the SAC also

In this case, the SAC alleges that "Sheriffs Detentions Policy, I.I, Emergency Alarms Systems, provides a means for detention facility staff and inmates to summon emergency medical assistance." SAC at 9:17-23 (elaborating that "[a]larm buttons that are located in

alleges that Mr. Boulanger was counted as well as checked on, albeit that Deputy Reyes may not have done proper checks. SAC at 17:4-17. The SAC also fails to allege that other deputies have performed improper checks, such that it was a "custom and practice," rather than just an oversight by Deputy Reyes. Second, Plaintiffs allege there was "[t]here was a custom and practice of failing to communicate the immediate medical needs of inmates experiencing a medical emergency." *Id.* at 36:15-17. However, here, the SAC alleges that as soon as deputies discovered Mr. Boulanger, they immediately notified Deputy Dixon by radio. *Id.* at 11:12-22. Further, to the extent this allegation pertains to the muting of the radios, there are no allegations that this was a pattern or practice that had ever been done before. Third, Plaintiffs allege that "[t]here was a custom and practice of not properly checking on the welfare of inmates, even those inmates known to have serious physical or psychiatric needs." *Id.* at 36:18-20. Again, these allegations fail to create a plausible claim for relief as to a policy of not properly checking on the welfare of inmates "known to have serious physical or psychiatric needs" given the SAC is devoid of allegations showing that the deputies who were supposed to be checking on Mr. Boulanger knew he had physical or psychiatric needs. Fourth, Plaintiffs allege the County had "a custom and practice of failing to conduct proper cell checks as required by County's own written policies." *Id.* at 36:21-23. In other words, Plaintiffs seem to allege there was a County custom and practice of violating the County's own written policies. Not only is this allegation not plausible, but it also belied by the facts alleging checks were performed, *id.* at 17:4-17, and that when supervisors took issue with the manner in which the checks were performed, they advised they would initiate an investigation, *id.* at 18:16-17. Fifth, Plaintiffs allege that "[t]here was a custom and practice of not properly investigating misconduct of deputies within County jail system." *Id.* at 36:24-26. These allegations are likewise implausible in light of Plaintiffs' own allegations that both forms of alleged misconduct were investigated. *See, e.g., id.* at 18:15-17 (alleging that "Lieutenant Defendant KAMOSS stated it was a poor quality check and would initiate an investigation for a policy violation"); *id.* at 18:25-28 (pleading that "[t]his case was heavily investigated by CLERB"). Thus, it appears Plaintiffs' own allegations are contradicted by other portions of the SAC alleging the conduct here was "heavily investigated." *Id.* at 18:25. Sixth, Plaintiffs allege that "[t]here was a custom and practice of falsifying information during investigations of misconduct and misleading the investigations by the independent citizens' review board." *Id.* at 36:27-37:1. However, other than alleging that Deputy Reyes said he performed soft counts, which based on the lack of thoroughness of his cell checks, those soft counts were deemed to be another form of inmate check as opposed to an official "soft count," *id.* at 16:24-17:17, Plaintiffs fail to plead any facts showing how or why the County falsified information.

inmate cells are required to be connected to a central control area to ensure constant monitoring of the alarms with appropriate, timely assistance dispatched to the scene of any alarm"); *see also* SAC at 10:1-4 (alleging that "COUNTY jail systems are installed with 'a call button inside cells that inmates can press at any point so they can speak directly with a deputy who can summon help'"). The SAC further pleads that "COUNTY jail systems require call buttons in cells because 'if there is a medical or mental health emergency, an inmate can request that correctional or medical staff help them get immediate medical treatment.'" SAC at 10:4-10. As such, clearly, the County had a policy in place to provide for emergency medical assistance. The SAC also alleges that Deputy Dixon "was tasked to monitor this alarm system and is required to dispatch medical assistance when the alarm is activated during the INCIDENT" but "did not do so." *Id.* at 9:23-26.

The SAC also alleges that Sheriff's Detentions Policy I.43, INMATE COUNT PROCEDURE, "establishes a uniform procedure for physically counting and verifying the well-being of all inmates" by requiring detentions staff to verify "each inmate's well-being through verbal or physical acknowledgment from the inmate." SAC at 15:28-16:5. SDCCJ's Green Sheet Policy requires these soft counts occur "at the beginning and end of [e]very shift, and that a printed Operations Report (County Sheet) is utilized while conducting these 'Soft Count.'" *Id.* at 16:12-17. The SAC also alleges the "COUNTY requires the Control deputy in the Central Jail 'shall log into the Jail Information Management System (JIMS) all alarms indicating date, time, location, and disposition.'" *Id.* at 10:11-14. "The Control Deputy shall test each system at the beginning of each shift." *Id.* 10:14-15. Thus, according to the SAC, the County had a policy in place to verify the well-being of inmates.

In this case, first, the Court agrees with Defendants' argument that the municipal claim is moot in light of Plaintiffs' failure to plead sufficient claims as to the individual defendants. *See* Mot. at 23:2-9; *see also Forrester v. City of San Diego*, 25 F.3d 804, 808 (9th Cir. 1994) ("[None] of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers if in fact the jury has concluded that

-79-

the officer inflicted no constitutional harm"). The Court also agrees that a plausible reading of the SAC indicates that Plaintiffs' allegations are not that the County had a policy directing that deputies mute the intercoms and perform only cursory checks on inmates; rather, Plaintiffs take issue with the fact that the alleged wrongful conduct was done *in violation* of County policy. *Id.* at 16:26-17:2. If the problem was that Deputies Dixon and Reyes violated County policy, the County should not be held liable unless it knowingly turned a blind eye to such behavior. While the SAC makes conclusory allegations that the County had "a custom, policy or repeated practice of condoning and tacitly encouraging the abuse of police authority, and disregard of constitutional rights of citizens," SAC at 38:2-12, Plaintiffs plead no factual allegations that would support this or make it plausible. Third, Defendants argue that even though the SAC references other jail deaths in an attempt to suggest a pattern of inadequate training, Plaintiffs cannot meet their burden of showing a pattern of similar constitutional violations by merely showing other jailhouse suicides; rather, they need to show that those suicides were also held to be constitutional violations. *Id.* at 25:10-18. Absent allegations of other instances where Deputy Dixon muted the intercom and Deputy Reyes performed cursory cell checks, there are no allegations of a pattern in the SAC. *See Scalia*, 308 F. Supp. at 1078 (noting that ordinarily plaintiffs must allege a pattern of similar constitutional violations by untrained officers).

### 4. *Plaintiffs Have Failed to Plausible Plead the Custom or Practice Caused the Constitutional Violation*

A plaintiff attempting to hold a county liable pursuant to Section 1983 under *Monell* "must demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *J.K.J.*, 2020 WL 738178 at *9-10. Here, at best, Plaintiffs' allegations are that the County "tacitly encouraged" or condoned constitutional violations. SAC at 38:2-12. However, again, these conclusory allegations are not plausible in the absence of facts pled to support them. Further, in *J.K.J.*, the Court likewise noted that "[t]he complaint does not adequately allege a specific official municipal policy that caused any of the constitutional violations (inadequately) alleged in the complaint." 2020

WL 738178 at *9-10.  The court examined the complaint and noted that "[t]he vague purported 'policies' listed in paragraph 65 of the complaint and relied on in the opposition by Plaintiff are merely conclusory statements that, if sufficient, would effectively hold the City liable simply for employing Officers . . . and simply because Jenkins' constitutional rights were allegedly violated." *Id.* at *9.  Similar to this case, the *J.K.J.* plaintiffs alleged that the first purported unconstitutional "policy" was that various officers "were not following written official policies, implying that if the City's policies had been followed, the alleged constitutional violations would not have occurred." *Id.* at *9.  However, because "[m]ere negligence in training or supervision . . . does not give rise to *Monell* claims, . . . even if the complaint stated a plausible claim for violation of Jenkins' constitutional rights, the *Monell* claims would be subject to dismissal." *Id.* at *9.  After dismissing the federal claims, the court also declined to exercise "supplemental jurisdiction over the state law claims [rather] than to wade into the plainly state law issues." *Id.* at *10.  Just as the plaintiffs in *J.K.J.* failed to plausibly plead that the County caused the alleged constitutional violations, Plaintiffs here likewise fail to do the same.  The SAC contains nothing more than conclusory recitals meant to trigger the elements of the claim pled without any factual support.

### G.   Plaintiffs' First Claim for Relief (Wrongful Death) and Sixth Claim for Relief (Survival Action)

Plaintiffs' First Claim for Relief for a wrongful death claim pleads, *inter alia*, that "Defendant deputies committed wrongful acts which proximately caused the death of Richard Boulanger," including but not limited to by depriving Mr. Boulanger "of his rights under the United States Constitution to be free from cruel and unusual punishment without due process." SAC at 24:9-12, 20-23.  Plaintiffs' Sixth Claim for Relief for a survival action alleges that Mr. Boulanger "was forced to endure great and conscious pain and suffering because of the Defendants" and "did not file a legal action before his death." *Id.* at 41:7-12.  Plaintiffs further allege in that claim, that Mr. Cavanaugh, "as personal representative and successor in interest of the Estate of Richard Boulanger claims damages

for the conscious pain and suffering incurred by Richard Boulanger, as provided under 42 U.S.C. § 1983." Notably, Plaintiff does not allege a violation of any amendment to the United States Constitution in the Sixth Claim for Relief.

Defendants argue that "Plaintiffs' first and sixth claims are for 'wrongful death' and 'survival action,'" but to the extent these claims are directed against (1) the individual deputy defendants, "they are duplicative of Plaintiffs' second claim for deliberate indifference," (2) supervisory defendants, they "are duplicative of Plaintiffs' fourth claim for failure to train," and (3) "the County, they are duplicative of Plaintiffs' third and fourth claims for municipal liability." Mot. at 26:17-28. Plaintiffs respond that their wrongful death and survival actions are not duplicative because "they both have different legal elements" as "[w]rongful death laws allow the Estate to bring the lawsuit in the first place" while "damages in a survival action covers [sic] the conscious pain Boulanger suffered before his death, whereas wrongful death may not." Oppo. at 34:9-20. Defendants respond by noting that "wrongful death actions by a surviving relative cannot be brought under Section 1983, as constitutional rights cannot be vicariously asserted." Reply at 3:2-3. Defendants elaborate that "Plaintiffs' assertion of 'survival rights' in cause of action six is subsumed by claims two, four, and five, brought under Section 1983," but that the claim "is grounded in Mr. Boulanger's 'conscious pain,' which is already the subject of Plaintiffs' other causes of action." *Id.* at 3:5-9.

As analyzed below, the Court finds that Plaintiffs' first and sixth claims must be dismissed. Plaintiffs' First Claim for Relief fails because a wrongful death claim must be brought by a decedent's dependents for injuries they suffered as a result of the decedent's death. Here, however, Plaintiffs' First Claim for Relief is essentially an improperly pled survival claim that seeks losses for injuries suffered by Mr. Boulanger, not his son, Mr. Cavanaugh. Further, to the extent that Plaintiffs bring the First Claim for Relief as a wrongful death claim under Section 1983, "Section 1983 actions may only be survival actions," and a survival action may only be brought by a decedent's successor in interest. *J.K.J.*, 2020 WL 738178 at *4. Here, the First Claim for Relief is brought by "All

Plaintiffs" when it may only be brought by Mr. Cavanaugh, as Decedent's dependent. Plaintiff's Sixth Claim for Relief likewise fails because it (1) fails to allege any constitutional violation, which is a prerequisite for a survival action, and (2) has not been established that Mr. Cavanaugh is the appropriate party to bring the survival action. Additionally, this claim is also brought by "All Plaintiffs" when it may not be brought by Mr. Cavanaugh and may only be brought the Estate. Further, because Section 1983 actions may only be survival actions, Claims Two through Five may only be brought by the Estate as well, rather than by Mr. Cavanaugh. Further, the state law claims are barred for failing to comply with California's claim filing requirements.

### 1. ***First Claim for Relief (Wrongful Death)***

Under California state law, CAL. CIV. PROC. CODE § 377.60, *et seq.*, a wrongful death action allows the close family members of a deceased individual to bring an action to compensate them for their own losses as a result of the decedent's death, meaning that damages for pain and suffering of the decedent or punitive damages on the decedent's behalf are not recoverable. *See, e.g.*, CAL. CIV. PROC. CODE § 377.60(a) (providing that "[a] cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by . . . the decedent's personal representative on their behalf," including but not limited to "[t]he decedent's surviving . . . children"); CAL. CIV. PROC. CODE § 377.61 ("In an action under this article, damages may be awarded that, under all the circumstances of the case, may be just, but may not include damages recoverable under Section 377.34"); *see also* CAL. CIV. PROC. CODE § 377.34 (setting forth the damages recoverable in a survival action). "A cause of action for wrongful death seeks to compensate the families of a decedent for the decedent's death." David J. Bederman, May the Estates of High-Seas Air Crash Victims Recover Damages for Their Victims' Pre-Death Pain and Suffering?, 7 *Preview of United States Supreme Court Cases* 431, 433 (1998). "Damages in a wrongful death case can be pecuniary, e.g., funeral costs and the victim's lost income, or nonpecuniary, e.g., a survivor's loss of companionship occasioned by the death." *Id.*

However, a decedent's children may only bring such an action "if they were dependent on the decedent." CAL. CIV. PROC. CODE § 377.60(b)(1); *see also Little v. City of Manhattan Beach*, 21 F. App'x 651, 652 (9th Cir. 2001) (holding that Decedent's mother, however, does not have standing to assert his Fourth Amendment rights because she has failed to meet her statutory burden of demonstrating that she was dependent on Little") (citing CAL. CIV. PROC. CODE § 377.60(b); *Moreland*, 159 F.3d at 369). The family of a decedent must file a wrongful death action within two years of the wrongful death. *See, e.g.*, CAL. CIV. PROC. CODE § 335.1. In this case, Mr. Boulanger died on February 14, 2016, so the wrongful death claim needed to be filed by February 14, 2018. Plaintiffs filed suit on February 9, 2018. Thus, Plaintiffs filed within the applicable statute of limitations. However, as discussed below, Plaintiffs have not pled that they complied with California's claim filing requirements before filing suit.

Such a plaintiff seeking to maintain a wrongful death action for any pecuniary loss sustained by the loss of a decedent's companionship has standing to sue for damages under Section 1983 pursuant to 42 U.S.C. § 1988 ("Section 1988"). *See, e.g., Galindo v. Brownell*, 255 F. Supp. 930, 931 (S.D. Cal. 1966) (denying the defendants' motion to dismiss the amended complaint, noting that "Plaintiff herein, who, judging from her amended complaint, seeks only to maintain a wrongful death action for any pecuniary loss sustained by loss of her son's society, comfort, attention, services and companionship, has standing as an heir of the decedent to sue for damages for his wrongful death, or so we must assume for purposes of passing upon a motion to dismiss") (internal citations omitted). Section 1988(a) provides that "[t]he jurisdiction . . . conferred on the district courts . . . for the protection of all persons in the United States in their civil rights . . . shall be exercised and enforced in conformity with the laws of the United States." However, where federal law is "deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, . . . statutes of the State wherein the court having jurisdiction of such civil . . . cause is held . . . shall be extended to and govern the said courts . . ." 42 U.S.C. § 1988(a).

In sum, "[i]n a wrongful death action, . . . the decedent's dependents may only pursue claims for personal injuries they have suffered as a result of a wrongful death." *Davis v. Bender Shipbuilding & Repair Co.*, 27 F.3d 426, 429 (9th Cir. 1994); *see also J.K.J.*, 2020 WL 738178 at *3-4. As a result, a wrongful death action brought by the estate seeking to assert violation of the deceased's rights under Section 1983 is not cognizable; rather, it must be brought by the decedent's dependents. *J.K.J.*, 2020 WL 738178 at *4. Here, under Plaintiffs' first claim for relief for wrongful death arising out of violation of Section 1983, both Plaintiffs (e.g., the Estate and Mr. Cavanaugh, as an individual) allege that all defendants violated their rights under the Fourth, Eighth, and Fourteenth Amendments. SAC at 23-24. However, this claim suffers fatally from several flaws. Further, while Section 1988 provides standing, it also requires the parties to look to state law for their remedies. As such, all plaintiffs pursuing a such claim only benefit from standing pursuant to Section 1988 to the extent that state law allows for such a claim.

First, the wrongful death claim is brought pursuant to Section 1983, but "Section 1983 actions may only be survival actions." *See Estate of Lopez v. Torres*, 105 F. Supp. 3d 1148, 1159-60 (S.D. Cal. 2015) (granting the defendant's motion to dismiss the wrongful death claims brought under Section 1983 and holding that heirs may not pursue a separate, federal cause of action for wrongful death under Section 1983); *see also Herd v. County of San Francisco*, 311 F. Supp. 3d 1157, 1163-64 (C.D. Cal. 2018) (dismissing a child's individual Section 1983 claim for excessive force and denial of medical treatment arising out of the shooting of her father by police, stating that the child "may not bring these claims personally because she was not directly subjected to excessive force or denied medical treatment."); *J.K.J.*, 2020 WL 738178, at *4 (holding that "to the extent the four federal claims, each brought under 42 U.S.C. § 1983, are intended to be wrongful death claims seeking damages for J.K.J.'s injuries, they are dismissed with prejudice."). "Thus, wrongful death actions by a surviving relative cannot be brought under Section 1983, as constitutional rights cannot be vicariously asserted." *J.K.J.*, 2020 WL 738178, at *4 (quoting *Hernandez-Cortina v. Cty. of Riverside*, No. EDCV1801579DDPSPX, 2019 WL

403957, at *3 (C.D. Cal. Jan. 30, 2019)); *see also Rose v. City of Los Angeles*, 814 F. Supp. 878, 881 (C.D. Cal. 1993) ("It is well established that the federally protected rights that are enforceable under § 1983 are 'personal' to the injured party."); *Alderman v. United States*, 394 U.S. 165, 174 (1969) (reiterating "the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted"); *Dohaish v. Tooley*, 670 F.2d 934, 936 (10th Cir. 1982) ("[T]he § 1983 civil rights action is a personal suit. It does not accrue to a relative...."); *Torres*, 105 F. Supp. 3d at 1159–60 (S.D. Cal. 2015) (noting that "[t]he confusion seems to be in that some courts (primarily in unpublished dispositions) have allowed claims for wrongful death under § 1983 to proceed," but "[w]hat is clear from these cases is that even if the claim was described in the pleadings as a wrongful death claim under section 1983," and even where they alleged Fourteenth Amendment claims, "the courts only allowed such claims to be maintained if they were construed as Fourth Amendment excessive force claims.").   In sum, while Mr. Cavanaugh may bring a survival action under Section 1983 to vindicate Mr. Boulanger's constitutional rights, his heirs may not pursue a separate, federal claim under Section 1983 for wrongful death. *Torres*, 105 F. Supp. 3d at 1160.

Second, even if a wrongful death claim were proper, where Plaintiffs have failed to show that Defendants violated Mr. Boulanger's constitutional rights, the claim would still fail.  Third, to the extent the Estate, on Decedent's behalf, brings a wrongful death claim for violation of Mr. Boulanger's constitutional rights, the claims are improperly brought and must be dismissed *with prejudice*. *See, e.g.*, *Estate of Wilson by & through Jackson v. Cty. of San Diego*, No. 20-CV-457-BAS-DEB, 2020 WL 3893046, at *6 (S.D. Cal. July 10, 2020) (Bashant, J.) (noting that "[a] wrongful death claim . . . must be brought by the decedent's dependents, and is limited to 'claims for personal injuries they have suffered as a result of a wrongful death'" *before* dismissing the claim as brought by the estate; "the claim is now only brought by Plaintiff Jackson").  Only the decedent's heirs may bring a wrongful death claim.  *Id.*  Fourth, to the extent that these claims are asserted by Mr. Cavanaugh, the SAC fails to allege facts within the first claim for relief as to the injuries

-86-

Mr. Cavanaugh suffered as a result of Decedent's wrongful death. Thus, the wrongful death claim is dismissed as to Mr. Cavanaugh. Finally, as discussed below, any state law claims against governmental entities may be subject to California's claim filing requirements. CAL. GOV'T CODE §§ 815, *et seq.*

The *J.K.J.* court addressed a similar situation and held that "to the extent the four federal claims, each brought under 42 U.S.C. § 1983, are intended to be wrongful death claims seeking damages for J.K.J.'s injuries, they are dismissed with prejudice." 2020 WL 738178, at *4. The court noted that to the extent state law authorized a wrongful death claim (e.g., as a claim authorized under state law and not as a Section 1983 claim), the issue of whether the child was the appropriate party to bring those claims was a novel issue of state law. *Id.* (noting that "California's intermediate appellate court recently held that the term 'children' as used in Section 377.60(a) is ambiguous," and in that case, "the fact that [the decedent] is her biological father, without more, is not enough to create wrongful death standing") As such, the court declined to exercise supplemental jurisdiction over the state wrongful death claims. *Id.*

As discussed below, while normally, the Court would dismiss the state law claims *without prejudice*, it dismisses them *with prejudice* here because the Court denies leave to amend due to the fact that, *inter alia*, even though Mr. Cavanaugh could plead sufficient facts to state a claim for relief under California's wrongful death laws, in light of the failure to plead cognizable claims for relief under Section 1983, the Court finds that state law claims predominate, and the Court should decline exercising supplemental jurisdiction. *See, e.g., Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) (noting that "in the usual case in which federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims"). Further, the Court has also determined that Mr. Boulanger's constitutional rights were not violated, and all individual defendants were entitled to qualified immunity.

### 2.    *Sixth Claim for Relief (Survival Action)*

"A claim under 42 U.S.C. § 1983 survives the decedent if the claim accrued before

the decedent's death, and if state law authorizes a survival action." *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006); *see also Smith v. City of Fontanta*, 818 F.2d 1411, 1416, *overruled on other grounds by Hodgers Durgin v. de la Vina*, 199 F.3d 1037, 1041 n. 1 (9th Cir. 1999) (providing that "[u]nder section 1988, a section 1983 claim that accrued before death survives the decedent when state law authorizes a survival action as a "suitable remed[y] . . . not inconsistent with the Constitution and laws of the United States . . ."") (citing 42 U.S.C. § 1988); *Robertson v. Wegmann*, 436 U.S. 584, 588–90 (1978)). "The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action." *Hayes v. Cty. of San Diego*, 736 F.3d 1223, 1228-29 (9th Cir. 2013) (citation omitted). Hence, to survive the motion to dismiss Plaintiffs' survival claim, the SAC must satisfy California's requirements.

California law authorizes a survival action by the decedent's personal representative for the purpose of compensating the estate for the losses suffered by the decedent prior to death, or damages that "survive" the decedent's death, including but not limited to punitive damages, medical bills, lost wages, etc. *See, e.g.*, CAL. CIV. PROC. CODE § 377.30 (providing that "[a] cause of action that survives the death of the person entitled to commence an action . . . passes to the decedent's successor in interest, . . . and an action may be commenced by the decedent's personal representative"); CAL. CIV. PROC. CODE § 377.34 (providing that "[i]n an action or proceeding by a decedent's personal representative . . . on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement"); CAL. CIV. PROC. CODE § 377.20(a) (providing that "[e]xcept as otherwise provided by statute, a cause of action for or against a person is not lost by reason of the person's death, but survives subject to the applicable limitations period"); CAL. CIV. PROC. CODE § 366.1 (providing that "[i]f a person entitled to bring an action dies before the expiration of the

applicable limitations period, and the cause of action survives, an action may be commenced before . . . the later of . . . (a) [s]ix months after the person's death [or] . . . (b) [t]he limitations period that would have been applicable if the person had not died"). "In a survival action, a decedent's estate may recover damages on behalf of the decedent for injuries that the decedent has sustained." *Davis v. Bender Shipbuilding & Repair Co.*, 27 F.3d 426, 429 (9th Cir. 1994); *see also J.K.J.*, 2020 WL 738178 at *3. "[U]nlike a wrongful death action, a survival action is a cause of action that existed while the decedent is alive and survives the decedent." *J.K.J.*, 2020 WL 738178 at *3 (citing *Adams v. Superior Court*, 196 Cal. App. 4th 71, 78-79 (2011)).

"It is undisputed that survival actions are permitted under § 1983 if authorized by the applicable state law." *Byrd v. Guess*, 137 F.3d 1126, 1131 (9th Cir. 1998), *superseded by statute as stated in Nicholson v. City of Los Angeles*, 935 F.3d 685, 696 (9th Cir. 2019) (applying California law). "It is also undisputed that California law applies to this case, and permits survival actions to be brought by the personal representative of the estate of the deceased or by the deceased's successors in interest." *Id.* Thus, any claims Mr. Boulanger may have had arising out of the Fourteenth Amendment, in theory, would survive and be capable of being maintained by his personal representative. *Smith*, 818 F.2d at 1416–17 (noting that "the Supreme Court has held that 'Fourth Amendment rights are personal rights which . . . may not be vicariously asserted,'" and as such, the decedent's "children were not directly subjected to the excessive use of state force and therefore cannot maintain personal causes of action under section 1983 in reliance on this Fourth Amendment theory").

In this case, Plaintiff's Sixth Claim for Relief for a survival action fails for two principal reasons. First, Plaintiff's Sixth Claim for Relief does not allege a constitutional violation. Because this claim for relief was brought under Section 1983, it requires allegations of a constitutional violation. 42 U.S.C. § 1983. Without them, it fails as a matter of law.

Second, even if the Sixth Claim for Relief pled a constitutional violation, "only a

Decedent's personal representative or successor in interest may assert a survival claim under § 377.30." *Cotta*, 79 F. Supp. 3d at 1161; *see also* Bederman, at 433 (noting that "[a] survival cause of action, as noted, is brought by the personal representative or estate of the decedent to recover damages the decedent could have recovered but for his or her death."). "Damages in a survival action usually relate to the victim's pain and suffering incurred just before death." Bederman, at 433. Under California Code of Civil Procedure, section 377.32 ("Section 377.32"), an individual seeking to commence a lawsuit as a decedent's successor in interest must execute and file a declaration, under penalty of perjury, stating, among other things: (1) whether a proceeding is pending in California for administration of the decedent's estate; (2) "if the estate was administered," and if so, attaching "a copy of the final order showing the distribution of the decedent's cause of action to the successor in interest"; (3) the declarant is the decedent's successor in interest and succeeds to the decedent's interest in the action; and (4) "[n]o other person has a superior right to commence an action or proceeding or to be substituted for the decedent in the pending action or proceeding." *See also J.K.J.*, 2020 WL 738178 at *3 (dismissing any claims arising out of a survival action "because Plaintiff has not satisfied the requirements for bringing a survival action"—namely, proving that Plaintiff was the successor in interest) (citing CAL. CIV. PROC. CODE § 377.32(4)-(5)). For purposes of filing a survival action, a successor in interest "means the beneficiary of the decedent's estate or other successor in interest who succeeds to a cause of action or to a particular item of the property that is the subject of a cause of action." CAL. CIV. PROC. CODE § 377.11. Where a decedent dies without a will, as was the case here, the "beneficiary of the decedent's estate," is defined as "all of the persons who succeed to a cause of action, or to a particular item of property that is the subject of cause of action, under Sections 6401 and 6402 of the Probate Code." CAL. CIV. PROC. CODE § 377.10(b). Section 6402 of California's Probate Code, governing an intestate estate where the decedent was not married, provides that where there is no surviving spouse, an intestate estate passes "to the issue of the decedent, the issue taking equally if they are all of the same degree of kinship to the decedent."

-90-

Here, Mr. Cavanaugh submitted a declaration on August 26, 2019, advising that: (1) Mr. Boulanger had died intestate; (2) "[n]o proceeding is now pending in California for administration of the decedent's estate"; but not whether one had been pending and concluded or might be initiated; and (3) he was "the decedent's successor in interest and succeed[ed] to the decedent's interest in this action." ECF No. 20 at 10:12-23. However, this declaration also advised that: (1) his father had never married; (2) he had been told by his father that his father had another child; (3) a detective located Desiree Boulanger, his half-sister, who said she did not want to be a part of their lives; and (4) he has no way of contacting her now. *Id.* at 9:16-10:3. Based on these facts, it would appear that Desiree Boulanger is entitled to take equally under Mr. Boulanger's estate as his other child. Thus, even though the Court granted Mr. Cavanaugh's application for order appointing him as Mr. Boulanger's successor in interest on October 10, 2019, this was in error. "The law of the case doctrine generally precludes a court from 'reconsidering an issue that already has been decided by the same court, or a higher court in the identical case.'" *Cotta*, 79 F. Supp. 3d at 1159 (citing *United States v. Alexander,* 106 F.3d 874, 876 (9th Cir.1997)). "The law of the case doctrine has three exceptions that may permit departure from the law of the case when: (1) the original decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or (3) substantially different evidence was adduced at a subsequent trial." *Cotta*, 79 F. Supp. 3d at 1159–60 (citing *Old Person v. Brown,* 312 F.3d 1036, 1039 (9th Cir. 2002)). Here, it would appear that the Court's decision was clearly erroneous and warrants reconsideration. Mr. Boulanger must submit a declaration from his half-sister, Desiree Boulanger, disclaiming her interest in the estate and/or this lawsuit. Otherwise, existing case law indicates this case must be dismissed. However, because the Court is dismissing the federal claims, which as a matter of law, are also survival actions, on the merits, the Court also dismisses the sixth claim for relief styled as a survival action.

In *J.K.J.*, a similar situation arose, and the court also dismissed the plaintiffs' survival action because it concluded the plaintiff's declaration did not comply with the

1   requirements under Section 377.32, governing survival actions.   2020 WL 738178 at *3.

2   After the first dismissal, the plaintiff, suing as the decedent's son's guardian ad litem, filed

3   a new declaration, which much like Mr. Cavanaugh's declaration here, conclusorily alleged

4   the elements required by Section 377.32.  *J.K.J. v. City of San Diego*, No. 19-CV-2123-

5   CAB-RBB, 2020 WL 2522045, at *3 (S.D. Cal. May 18, 2020).  However, the Court noted

6   that "Section 377.32(5) requires the declaration to include 'facts in support' of statements

7   that the plaintiff is the successor in interest and succeeds to the decedent's interest in the

8   lawsuit." *Id.* at *3.  There, the only fact in the declaration supporting the statement that the

9   son was the successor in interest to the decedent was that the son was the decedent's

10  "biological son." *Id.*  The court reasoned that if the son was the decedent's "only child, the

11  Court might be satisfied that the declarations are sufficient and that J.K.J. has standing to

12  bring a survivor action by himself," but there was no dispute that the decedent "had two

13  other biological children," who "Plaintiff rightly concedes . . . have an equal right as a

14  successor in interest to the survival claims asserted in this action." *Id.* (citing CAL. PROB.

15  CODE § 6402).  As a result, the court noted that "if the FAC could otherwise avoid

16  dismissal, the Court would solicit briefing from the parties concerning whether Ms.

17  Jenkins' other children are required parties who must be joined under Federal Rule of Civil

18  Procedure 19." *Id.*  Nonetheless, it found such briefing unnecessary because the FAC in

19  that case did "not remedy the deficiencies of the original complaint and is dismissed with

20  prejudice for failure to state a claim." *Id.*  Thus, the court dismissed the amended complaint

21  *with prejudice. Id.*

22      Here, the Court finds that this Court must follow the *J.K.J.* court and dismiss the

23  survival action because Mr. Cavanaugh has failed to provide the Court with sufficient facts

24  showing he is Mr. Boulanger's successor in interest.  In doing so, the Court reverses its

25  order appointing Mr. Cavanaugh as successor in interest. *Cotta*, 79 F. Supp. 3d at 1159.

26  **H.   Plaintiffs' Failure to Comply with Government Claims Act Requirements
        with Respect to the State Law Claims**

27

28      Although Defendants failed to raise this issue, the Court raises it *sua sponte* given it

-92-

1  factors into the Court's decision on whether to dismiss this case *with prejudice.*

2  The California Government Claims Act (also known as the California Tort Claims

3  Act) (the "CGCA") immunizes public entities from tort liability unless a particular statute

4  has explicitly created liability. CAL. GOV'T CODE § 815(a). In order to bring a suit for

5  money damages against a public entity or its employees, the CGCA requires that prior to

6  filing suit, a claimant must file and present a written claim to the public entity, and that the

7  public entity must either act upon or reject the claim. CAL. GOV'T CODE § 945.4; *see also*

8  CAL. GOV'T CODE § 905 (providing that "all claims for money or damages against local

9  public entities" must "be presented in accordance with . . . Section 910," except for certain

10  exceptions, none of which apply in this case); CAL. GOV'T CODE § 910 (setting forth the

11  requirements for the contents of a claim against a local public entities). A claim relating

12  to personal injury, such as Plaintiffs' claims, must be presented within six months after the

13  accrual of the cause of action. CAL. GOV'T CODE § 911.2(a). However, a party may make

14  an application to present such a claim after the expiration of the six month period, provided

15  the claimant presents an application to present a late claim within a reasonable time period,

16  not to exceed one year after the accrual of the cause of action, CAL. GOV'T CODE § 911.4(a)-

17  (b), and which includes one of the listed reasons for late presentation of the claim, including

18  but not limited to excusable neglect, CAL. GOV'T CODE § 911.6(b)(1). Compliance with

19  the CGCA is mandatory, rather than a simple procedural requirement, and failure to comply

20  may prove fatal to a cause of action. *See Mangold v. Cal. Pub. Utilities Comm'n*, 67 F.3d

21  1470, 1477 (9th Cir. 1995) (noting that the CGCA requires the timely presentation and

22  filing of a written claim, and a rejection of that claim in whole or in part, "as a condition

23  precedent to suit against a public entity"); *Lindsay v. Fryson*, 2011 U.S. Dist. LEXIS

24  62834, 27-28, 2011 WL 2444813 (E.D. Cal. June 14, 2011) (while "[a] plaintiff's 'failure

25  to allege facts demonstrating or excusing compliance with the claims presentation

26  requirement subjects a claim against a public entity' to dismissal for failure to state a

27  claim," a court need not resolve factual disputes regarding actual compliance with the

28  CGCA when ruling on a Rule 12(b)(6) motion).

As stated, the CGCA immunizes public entities from tort liability unless a particular statute explicitly creates liability. CAL. GOV'T CODE § 815(a). As pertains to this case, Section 844.6 of California's Government Code generally immunizes public entities from liability for injuries to prisoners. CAL. GOV'T CODE § 844.6(a) (providing that "except as provided in this section and in Section . . . 845.6," a public entity, like the County of San Diego, "is not liable for" an injury (1) "proximately caused by any prisoner" or (2) "to any prisoner"); *see also* CAL. GOV'T CODE § 844 (defining "prisoner" as "an inmate of a prison, jail, or penal or correctional facility."). This immunity from liability for public entities and employees includes the failure of an employee to "to furnish or obtain medical care for a prisoner in his custody." CAL. GOV'T CODE § 845.6. Here, Plaintiffs seek to sue a public entity and public employees for injuries to a prisoner by a prisoner. Further, Plaintiffs' allegations also plead that Mr. Boulanger's self-inflicted injuries worsened due to a delay in medical care. However, Section 845.6 seems to immunize the employees for liability for failure to furnish or obtain medical care. As pled, it would appear the CGCA immunizes the County and Deputy Defendants from liability. However, this immunity does not exonerate "a public employee from liability for injury proximately caused by his negligent or wrongful act or omission." CAL. GOV'T CODE § 844.6(d). Section 845.6, however, contains another exception to this general immunity providing: "[A] public employee, and the public entity where the employee is acting within the scope of his employment, is liable if [1] the employee knows or has reason to know that the prisoner is in need of immediate medical care and [2] he fails to take reasonable action to summon such medical care." CAL. GOV'T CODE § 845.6; *see also Palacios v. Cty. of San Diego*, No. 20-CV-450-MMA (DEB), 2020 WL 4201686, at *17–19 (S.D. Cal. July 22, 2020) (holding that the deputies and the County were immune from suit under Section 845.6 where the detainee had been receiving care for suicidal ideations but, nonetheless, committed suicide in his cell, while under observation). Here, however, Plaintiff's SAC does not plausibly plead that Deputy Defendants, Supervisor Defendants, or the County knew or had reason to know Mr. Boulanger was in need of immediate care and failed to take action to summon care. Instead,

it alleges certain information was revealed during booking (although not necessarily to any of the named defendants), which Plaintiffs believe should have caused reason to know Mr. Boulanger was at risk of suicide. After Mr. Boulanger attempted suicide, the SAC alleges he was provided medical care as soon as he was discovered, which resulted in his resuscitation.

Further, even though unlike a claim against a public entity, a claim against a current or former public employee "for injury resulting from an act or omission in the scope of his employment "need not be presented as a prerequisite to the maintenance of an action against" that employee, CAL. GOV'T CODE § 950, that cause of action against the public employee "is barred if an action against the employing public entity for such injury is barred." CAL. GOV'T CODE § 950.2. "Generally, a public employee is acting in the course and scope of her employment when she is engaged in work she was employed to perform, or when the act is an incident to her duty and was performed for the benefit of her employer and not to serve her own purposes or convenience." *Asuncion*, 2020 WL 2028531 at *4-6 (granting summary judgment on Plaintiff's claims for wrongful death negligence because one plaintiff's claim was rejected and the lawsuit was filed more than six months later while another Plaintiff never alleged he submitted any claim related to the suicide or that he was exempt from the claim-filing requirements, and as such, that plaintiff had failed to comply with the CGCA). Accordingly, and as discussed below, because the claim against the County is barred so are any claims against the deputies, who were public employees acting within the scope of their employment.

For example, in *Karim-Panahi v. Los Angeles Police Department*, 839 F.2d 621, 627 (9th. Cir. 1988), *abrogated in part as stated in Boarman v. County of Sacramento*, 2013 U.S. Dist. LEXIS 46326, 2013 WL 1326196, 7 (E.D. Cal. Mar. 29, 2013), the Ninth Circuit held that Plaintiff Karim-Panahi's amended complaint failed to allege compliance with the CGCA procedures, and as a result, it concluded the lower court appropriately dismissed his state law tort claims. It found Karim-Panahi's pendent state law claims against both individual and public entity defendants barred absent proof he presented them to the city

-95-

and the police department before commencing suit. *Id.* (citing Cal. Gov't Code §§ 905, 945.4, 950.2); *see also Ortega v. O'Connor*, 764 F.2d 703, 707 (9th Cir. 1985), *rev'd on other grounds*, 480 U.S. 709 (1987) (a plaintiff's failure to comply with the CGCA's filing requirements bars pendent state claims). However, while the Court concluded that the lower court erred by failing to instruct Karim-Panahi on the necessity of alleging compliance with the exhaustion requirements, it also held that leave to amend is unnecessary where it is clear the deficiencies of the compliant cannot be cured by amendment. *See* 839 F.2d at 627.

Here, the County of San Diego is a public entity. *See* Cal. Gov't Code § 811.2 ("'Public entity' includes the state . . . a county, city, district, public authority, public agency, and any other political subdivision or public corporation in the State."); *see also Willis v. Reddin*, 418 F.2d 702, 704 (9th Cir. 1969) (holding that Cal. Gov. Code section 950.2 bars action against a public employee where failure to comply with the presentation requirement bars action against public entity for same injuries). Thus, because Defendants qualify as a public entity, like the plaintiff in *Karim-Panahi*, Plaintiff's state law claims are subject to the claim presentation requirements of the CGCA. *C.f. Daluise v. Mccauley*, No. 215CV02701CASJEMX, 2015 WL 7573649, at *3 (C.D. Cal. Nov. 24, 2015) ("Because the County has rejected her claims, plaintiff is now entitled to proceed in court on those claims."). Also similar to *Karim-Panahi*, Plaintiff's SAC failed to allege compliance with these requirements. Although a court could grant leave to amend to allege compliance with those requirements, because the rest of his federal claims fail to state a claim for relief as a matter of law, doing so would be futile. *Karim-Panahi*, 839 F.2d at 627. To the extent Plaintiffs never filed a claim, they are barred from doing so at this point because the period to file a late application has expired. The one year time period within which to make an application to present a late claim has passed. *See* CAL. GOV. CODE § 911.4(a)-(b). Thus, even if they could plead excusable neglect, they are also well past the one year deadline.

In sum, the CGCA "establishes certain conditions precedent to the filing of a lawsuit against a public entity." *Asuncion*, 2020 WL 2028531 at *4-6 (granting summary judgment

-96-

on Plaintiff's claims for wrongful death and holding that Plaintiff failed to comply with the CGCA where "Plaintiff does not aver that he submitted any claim regarding Wagner's suicide, nor does he contend that he was somehow exempt from complying with this requirement") (citing *California Rest. Mgmt. Svs. v. City of San Diego*, 195 Cal. App. 4th 1581, 1591 (2011)). "The 'failure to timely present a claim for money or damages to a public entity bars a plaintiff from filing a lawsuit against that entity.'" *Id.* (citing *State of California v. Super. Crt.*, 32 Cal. 4th 1234, 1239 (2004)). Here, Plaintiffs' wrongful death claim arises under state law. Plaintiffs also allege that Defendants owed a duty under Government Code 845.6 to recognize the suicidal potential of high risk inmates and provide prompt medical care to opiate inmates in a state of detox. SAC at 29:8-25. Accordingly, because Plaintiffs sued the County of San Diego as well as public employees, they had a duty to present the claim as well as allege compliance with the claim presentation requirements of the CGCA in their complaint. Plaintiffs failed to include any such allegations.

Accordingly, the Court grants Defendants' motion to dismiss Plaintiffs' state law claims *with prejudice* due to the fact the presentation requirement of the CGCA bars Plaintiff from amending their complaint to allege damages arising from personal injury against public entities and employees because the period to present late claims has expired.

### I.    Motion to Strike

Because the Court has granted Defendants' Motion to Dismiss in full and is denying leave to amend, the Court concludes the Motion to Strike is moot. *See, e.g.*, *Tur v. YouTube, Inc.*, 562 F.3d 1212, 1214 (9th Cir. 2009) (concluding that "an issue is moot when deciding it would have no effect within the confines of the case itself").

### J.    Leave to Amend

Courts have broad discretion to grant leave to amend a complaint. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 420 (9th Cir. 2020). This discretion includes the right to deny leave to amend where amendment may prove to be an effort in futility. *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 538 (9th Cir. 1989). Here, the Court notes that

-97-

Plaintiffs filed this case on February 9, 2018.  ECF No. 1.  Thus, the case has been ongoing for two and a half years; yet, it remains in the pleading stage.

In determining whether a plaintiff should be granted leave to amend, courts consider "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore*, 885 F.2d at 538.  "[W]here the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, the district court's discretion to deny leave to amend is particularly broad." *Nguyen*, 962 F.3d at 420 (holding that the district court did not err by denying leave to amend "because it was clear that the plaintiff had made her best case and had been found wanting") (internal quotations omitted).  For example, in *Parents for Privacy v. Barr*, 949 F.3d 1210, 1239 (9th Cir. 2020), the Ninth Circuit affirmed the district court's denial of leave to amend because "[f]urther amendment would simply be a futile exercise."  In doing so, the Court noted that "[t]he problem with Plaintiffs' complaint, however, is not the sufficiency of their factual allegations" but "[r]ather, as we have explained above, Plaintiffs' legal theories fail." *Id.*  There, "[a]mending the complaint will not change, for example, the extent of the rights that are protected by the Fourteenth Amendment's Due Process Clause." *Id.*  Plaintiffs' allegations suffer from the same deficiencies.

Likewise, in *J.K.J.*, the court noted that the plaintiff's first amended complaint did "not remedy the defects from the original complaint with respect to allegations of a specific municipal policy or custom that caused any of the constitutional violations (inadequately) alleged in the complaint." 2020 WL 2522045, at *8.  Further, "[t]he addition of allegations concerning the training Officers Durbin and Taub received in accordance with . . . the San Diego Police Department Policy Manual are not sufficient to save this claim from dismissal" because the allegations undermined the claim by implying "that the individual officers did not follow San Diego Police Department policy and their training." *Id.*  "In other words, City policy was not the 'moving force' behind Ms. Jenkins' injuries because,

-98-

according to the FAC, had the individual defendants complied with the policies in question, Ms. Jenkins' constitutional rights would not have been violated." *Id.*

Similarly, here, Plaintiffs have had "three bites at the apple." Yet, two and a half years and three attempts later, Plaintiffs have failed to state a plausible claim for relief. If Plaintiffs have some missing facts that would transform the complaint into a plausible claim for relief, such facts should have been included in the previous three complaints. Further, although the last sentence of the Opposition requests leave to amend, Plaintiffs fail to state how or why leave to amend would cure the inadequacies pointed out by Defendants. Even if the Court considered the facts stated in the Opposition which had not been alleged in the SAC, they are still not enough to create a cognizable legal theory. "[R]epeated failure to cure deficiencies by previous amendments" is one of the factors courts should considered when evaluating leave to amend. Further, this Court finds that the facts, as pled, simply do not give rise to a violation of Section 1983. As such, further amendment would prove futile. Thus, because Plaintiffs have been granted leave to amend, yet still failed to add the requisite particularity, they have made their best case. *Nguyen*, 962 F.3d at 420. Accordingly, as in *Barr*, "[f]urther amendment would simply be a futile exercise" because Plaintiffs' legal theories fail as a matter of law. 949 F.3d at 1239. Thus, the court exercises its broad discretion to deny leave to amend. *Nguyen*, 962 F.3d at 420.

## V.   CONCLUSION

For the above reasons, the Court **ORDERS** as follows:

1.    The Joint Motion to Dismiss Defendants Brett Germain and Michael Pacheco, ECF No. 61, is **GRANTED**.

2.    Defendant's Motion to Dismiss Plaintiffs' SAC is **GRANTED** as follows:

a.    All Defendants are dismissed to the extent they are sued in their official capacity.

b.    All Doe Defendants are dismissed for want of prosecution pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.

c.    Plaintiffs' first claim for relief for wrongful death under 42 U.S.C. §

-99-

1983 is **DISMISSED *WITH PREJUDICE*** as it is not a cognizable claim under Section 1983, which only allows for survival actions.

        d.    Plaintiffs' second claim for relief (deliberate indifference to medical needs), third claim for relief (loss of familial relationship), fourth claim for relief (failure to properly train), and fifth claim for relief (*Monell* liability) are **DISMISSED *WITH PREJUDICE*** for failure to plead facts that could state a plausible claim for relief.

        e.    Plaintiffs' sixth claim for relief for a survival action is also **DISMISSED *WITH PREJUDICE*** because Mr. Cavanaugh has failed to show he (1) is the successor in interest and (2) complied with the claim-filing requirements of the CGCA.

    3.    Defendants' Motion to Strike is **DENIED** as moot.

    **IT IS SO ORDERED.**

DATED:   November /2 , 2020

                                          **HON. ROGER T. BENITEZ**
                                         United States District Judge